IN THE MATTER OF THE APPLICATIONS FOR THE COMMIT-
MENT OF S.L., A.F., P.M., F.G., R.B., E.A., C.S., J.A. AND R.G.,
TO THE GREYSTONE PARK PSYCHIATRIC HOSPITAL.

Argued May 9, 1983—Decided July 20, 1983.

*Laura M. LeWinn,* Acting Director, Division of Mental Health Advocacy, argued the cause for appellants S.L., et al. (*Joseph H. Rodriguez,* Public Advocate, attorney; *Michael L. Perlin,* Special Counsel to the Public Advocate and *Ivy Starr Minely,* Designated Counsel, on the briefs).

*Paula R. Goldwater,* Assistant County Counsel, argued the cause for respondent County of Essex (*David H. Ben-Asher,* Essex County Counsel, attorney).

*Steven Wallach,* Deputy Attorney General, argued the cause for intervenor-respondent Attorney General of New Jersey (*Irwin I. Kimmelman,* Attorney General of New Jersey, attorney; *James J. Ciancia,* Assistant Attorney General, of counsel).

The opinion of the Court was delivered by

HANDLER, J.

The nine consolidated cases before us focus our attention on the plight of individuals who have been committed in mental institutions for most of their adult lives.[1] In seven of the cases, a court determined that after decades in mental hospitals the appellants were no longer committable, although they remained incapable of carrying on an independent and self-sufficient life. In the two remaining cases, appellants argued unsuccessfully

[1] The following chart indicates the current age and date of commitment of each applicant.

| Appellant | Current Age | Date Committed |
|---|---|---|
| S.L. | 71 | July 30, 1934 |
| A.F. | 70 | February 13, 1942 |
| P.M. | 74 | October 22, 1931 |
| F.G. | 36 | August 21, 1963 |
| R.B. | Died at age 78 in 1981 | February 8, 1952 |
| E.A. | 65 | June 28, 1965 |
| C.S. | 83 | May 12, 1937 |
| J.A. | 40 | November 17, 1980 |
| R.G. | 48 | March 6, 1980 |

J.A. was involuntarily committed in 1980 after a period of nine years confinement in Greystone Park Psychiatric Hospital on a transfer from the Department of Mental Retardation. R.G. had been hospitalized intermittently over the past 30 years, including a confinement at Greystone from 1971 to 1977.

that their situations were similar. Together these cases require us to determine the legal status of individuals who no longer meet our standards for civil commitment, yet who require some degree of custodial care, and the procedures necessary to ensure protection of their legal rights.

I

In each of these nine cases,[2] appellant challenges an order continuing civil commitment at Greystone Park Psychiatric Hospital. Seven of the patients[3] had been ordered discharged pending placement by a Chancery Division judge in proceedings prior to the hearings that are the subject of these appeals. The status of these individuals, referred to by the abbreviation "DPP," is not formally recognized by any statute, administrative regulation or court rule. Nevertheless, administrators of the mental health system and many judges have assumed the existence of such a status and used the DPP classification for patients who cannot live independently outside the institution but who are no longer legally committable under conventional standards. See *R.* 4:74–7(f) (individual must be dangerous to self, others or property by reason of mental illness in order for court to enter judgment of commitment). These patients, although technically "discharged," remain in mental hospitals until appropriate outside placements become available.

In these seven cases the appellants had been classified by a court as DPPs in proceedings conducted pursuant to *R.* 4:74–7(f) because they no longer met the legal standards for commitment due to remission or the effects of aging and physical disease. In late 1980, each was notified that a further hearing would be

---

[2]Although appellant R.B. has died, appellants S.L. and C.S. have been transferred to other facilities and appellant R.G. has become a voluntary patient, the State does not allege that this matter is moot. This opinion addresses all nine of the cases in order to treat more clearly and fully the issues raised by the consolidated appeals.

[3]These seven individuals are S.L., A.F., P.M., F.G., R.B., E.A., and C.S.

conducted to review their possibilities for placement. At these hearings conducted on November 18 and December 17, 1980, a second court refused to recognize the validity of the previous adjudication of appellants as DPPs, finding the DPP classification to be a nullity. The court instead conducted a commitment review hearing and found that each appellant met the legal standards for commitment and was not eligible or entitled to be discharged.[4]

In the two remaining appeals, appellants J.A. and R.G. were never judicially declared to be DPPs. However, at the periodic hearings reviewing their commitments pursuant to *R.* 4:74–7(f), they requested designation as DPPs. The court denied this request, declaring that the DPP classification did not exist.

The nine cases were consolidated on appeal to the Appellate Division, which dismissed the appeals on February 24, 1982. The court indicated that a decision on the merits of the cases would require the court in effect to amend the court rules and would have "enormous legislative and fiscal ramifications." Deferring to the Supreme Court's rule-making power and the Legislature's economic judgment, the Appellate Division held the issues presented to be nonjusticiable. Appellants' petition for certification was granted on May 18, 1982.

II

The central issue in these appeals implicates the legal rights of patients in State mental hospitals who have been discharged under current standards governing civil commitments but who cannot survive independently outside the institution without some care and supervision. The resolution of this issue requires

---

[4]In the cases of S.L. and C.S., the court adjourned the commitment review hearing for two months when counsel indicated it had prepared for a placement hearing and was not prepared for a commitment review hearing.

careful examination, determination and definition of the appropriate legal status of the appellants.[5]

The Public Advocate, representing the appellants, urges the Court to give formal recognition to the DPP status as an intermediate stage between involuntary commitment and immediate discharge. He argues that DPP status is a logical hybrid status that responds to the legal and human situation of these patients and is consistent with the existing statutory, regulatory, and decisional law. The Public Advocate emphasizes that recognition of the DPP classification and promulgation of appropriate procedural guidelines will ensure that committed persons who are no longer dangerous will be integrated in an expeditious manner into settings less restrictive of their liberty.[6]

---

[5]We disagree with the Appellate Division which dismissed these appeals as nonjusticiable out of concern of encroaching upon this Court's rule-making authority and the Legislature's fiscal powers. The issues presented are capable of judicial resolution. They require the Court to determine the legal status of certain individuals who are currently in mental institutions, the legal procedures necessary to protect their legal rights, and the duties of the State in regard to their care. In numerous situations, procedures ensuring the rights of individuals in the judicial process may be established by rule or by decision. *See, e.g., State v. Krol,* 68 *N.J.* 236 (1975); *State v. Fields,* 77 *N.J.* 282 (1978); *see also State v. Hall,* 93 *N.J.* 552 (1983); *State v. Valencia,* 93 *N.J.* 126 (1983). Further, these decisions are within the province of the judiciary even though they have a fiscal impact on the State budget, *see, e.g., New Jersey Ass'n for Retarded Citizens v. Department of Human Serv.,* 89 *N.J.* 234 (1982). It is clear that courts cannot compel legislative appropriations, *City of Camden v. Byrne,* 82 *N.J.* 133, 150 (1980), but no such action is contemplated or required by this case.

[6]Under the procedures urged by the Public Advocate, regular placement review hearings would be conducted for individuals who had been judicially declared to be DPPs. The Public Advocate suggests the following procedural rules for these hearings.

(1) Such hearings shall be full inquiries into the question of placement into an appropriate facility which provides the patient with his right to treatment in the least restrictive alternative setting.

(2) Regularly, hospital staff workers, employees of the Bureau of Transitional Services within the Department of Human Services, members of the patient's families and/or friends, and employees of community agencies shall be asked to testify at such hearings as to the nature of the

Essex County Counsel and the Attorney General resist formal declaration or recognition of DPP status and, instead, endorse the report of the Supreme Court Task Force on Mental Commitments which recommended creation of a status entitled "Continued Commitment Pending Placement."[7] This suggestion treats individuals who are unable to care for themselves as dangerous to themselves and therefore committable. It recognizes, how-

---

efforts by responsible parties to secure appropriate alternative placements.

(3) Inquiry shall be made of the patient in each case as to his placement desires. If a DPP patient indicates a preference to stay in the hospital as a voluntary patient, the court shall treat this request as if it were brought pursuant to that aspect of *R.* 4:74–7(j)(1) dealing with summary reviews of voluntary status in juvenile matters, *cf. In re Williams,* 140 *N.J.Super.* 495 (Essex Cty. J. & D.R.Ct.1976).

(4) DPP review hearings shall be scheduled every three months as long as a DPP Patient remains hospitalized.

(5) The burden remains on the State and/or county to show by at least clear and convincing evidence (a) what alternatives were available, (b) what alternatives were investigated, and (c) why such investigated alternatives were not suitable.

(6) In weighing each case, the court should consider at least the following factors: (a) the patient's clinical condition; (b) the length of the patient's stay in the hospital; (c) the potential of harm to the patient if he spends additional time in the hospital; (d) the type of facility to which release would be appropriate; (e) within the facilities described in (d), the range of available facilities; (f) the restrictions which would be imposed on the patient in each such facility; (g) the extent to which each such facility comports with the patient's expressed desires; and (h) the realistic opportunity the patient will ever have of being fully discharged from the facility in question.

(7) Following a DPP placement, the courts shall retain jurisdiction to review the continued appropriateness of such placement; such reviews shall be periodic and summary in nature, but, if the patient so requests, a full hearing as outlined in (1) through (6), above, will be held.

[7]The Supreme Court Task Force on Mental Commitments, which includes representatives from the Attorney General's staff and the Public Advocate, had been considering the issue of persons discharged but awaiting placement at the time this appeal was originally scheduled for argument. At the request of the Task Force, the Court delayed argument pending receipt of the Task Force report on the matter. The recommendations contained in the report

ever, that such individuals do not require "treatment in a mental hospital if a suitable, alternative appropriate placement can be found." Supreme Court Task Force on Mental Commitments, *Patients Awaiting Placement* 7 (May 2, 1983). The Report thus recommends annual judicial hearings to review efforts to place such committed individuals in suitable and appropriate alternative placements.[8]

---

represent the views of the majority of Task Force members; a dissenting report was filed by the Public Advocate's office.

[8]Specifically, the Task Force recommends amendment of *R.* 4:74–7(g)–(k) as follows:

(g) *Patients Awaiting Placement.* If at any review hearing subsequent to a final order of commitment, the proofs demonstrate that a patient is dangerous to himself or others, but does not require treatment in a mental hospital if a suitable, alternative appropriate placement can be found, said patient shall be classified as Continued Committed Pending Placement, and the court may continue commitment pending suitable and appropriate placement. However, a hearing shall be held to review orders issued under this paragraph within six months from the entry of the order and at least annually thereafter. The court may, at any time on its own motion or on motion of counsel for good cause shown, require reports or conduct hearings as it deems necessary for the purpose of reviewing the status of the patient. In determining suitable and appropriate placement, the court may make the necessary inquiries including but not limited to facilities available, the efforts made to investigate and initiate placement, the patient's desires, family resources and any other inquiries the court may deem pertinent and appropriate. The notice provisions of subparagraph (c)(3) of this rule shall apply to review hearings held under this paragraph. In the event that suitable and appropriate placement is arranged for said patient, the institution shall discharge the patient and so advise the court and counsel.

(h) *Judgment of Release.* A judgment discharging the patient may contain in appropriate circumstances conditions for the release such as attendance at a non-residential mental health facility or other form of supervision. Any such conditions shall be stated in the order of discharge with particularity. The continuation of any such conditions shall be subject to periodic review as provided by paragraph (f) hereof.

(i) *Legal Settlement.* The patient's legal settlement providing for the payment of the expense of his care and treatment shall be considered either at the commitment hearing or at a hearing on notice which may be held by the county adjuster thereafter and reported to the court. In either case the settlement shall be on order of the court. The person or

We begin our evaluation of these various contentions by reviewing certain basic principles governing the civil commitment process. The authority of the State to civilly commit citizens is said to be an exercise of its police power to protect the citizenry and its *parens patriae* authority to act on behalf of those unable to act in their own best interests. *Addington v. Texas,* 441 U.S. 418, 426, 99 *S.Ct.* 1804, 1809, 60 *L.Ed.2d* 323, 331 (1979); *O'Connor v. Donaldson,* 422 *U.S.* 563, 582–83, 95 *S.Ct.* 2486, 2497, 45 *L.Ed.2d* 396, 411–12 (1975) (Burger, C.J., concur-

---

public body charged with the legal settlement shall also be charged with the fee of assigned counsel and guardian ad litem and necessary costs incurred by him in representing the patient. If the assigned counsel or guardian ad litem is employed by a legal services project, his fee shall be ordered payable thereto. If he is employed by the State or a county, no fee allowance shall be made.

(j) *Filing.* All documents referred to in this rule shall be filed in the County Clerk's office together with an affidavit of service of all notices herein required. The files of the County Clerk shall not, however, be open to inspection by any person other than assigned counsel, guardian ad litem and the county adjuster except on court order in exceptional circumstances and for good cause shown.

(k) *Institutionalization of Minors.* A minor shall be institutionalized for the treatment of mental illness only upon court order entered in accordance with the procedures prescribed by paragraphs (b) through (g), inclusive, of this rule except that (1) Irrespective of whether or not he meets the standard of involuntary commitment stated by this rule, any minor 14 years of age or over may request his admission to an institution for psychiatric treatment provided the court on a finding that the minor's request is voluntary, enters an order approving the admission. If an order approving a voluntary admission of a minor is entered, the minor may discharge himself from the institution in the same manner as an adult who has voluntarily admitted himself. An order approving a voluntary admission shall be reviewable as provided in paragraph (f) of this rule, however, said review may be summary, and (2) The rule shall not be construed to require any court procedure or approval for the admission of a minor by his parent, parents, or other person in loco parentis to any institution for the evaluation or diagnosis of a mental condition provided the admission does not exceed seven days. If further hospitalization is then required, the applicant shall proceed in accordance with paragraph (e) of this rule. If an application for commitment is made during such admission, the final hearing shall be held within 20 days from

ring). However, because commitment effects a great restraint on individual liberty, this power of the State is constitutionally bounded. *See Jones v. United States,* —— *U.S.* ——, ——, 103 *S.Ct.* 3043, 3048, 77 *L.Ed.2d* 694 (1983); *Addington v. Texas, supra,* 441 *U.S.* at 425–26, 9 *S.Ct.* at 1809, 60 *L.Ed.2d* at 330–31; *O'Connor v. Donaldson, supra,* 422 *U.S.* at 580, 95 *S.Ct.* at 2496, 45 *L.Ed.2d* at 410 (Burger, C.J., concurring). In order to comply with due process, the State must adhere to certain procedures when committing individuals. The individual is entitled to a judicial hearing at which the State must establish the grounds for commitment by clear and convincing evidence. *Addington v. Texas, supra.* The individual who is the subject of the hearing has the right to notice of the hearing, the right to present evidence and the right to be represented by counsel. *See Vitek v. Jones,* 445 *U.S.* 480, 100 *S.Ct.* 1254, 63 *L.Ed.2d* 552 (1980) (plurality opinion) (procedural rights of prisoner upon transfer to mental hospital).

In addition to these procedural guarantees regulating the commitment process, the scope of the commitment power itself is limited. The State cannot constitutionally commit individuals to mental hospitals solely on the basis of mental illness. As the Supreme Court explained in *O'Connor v. Donaldson, supra,*

> A finding of "mental illness" alone cannot justify a State's locking a person up against his will and keeping him indefinitely in simple custodial confinement. Assuming that that term can be given a reasonably precise content and that the "mentally ill" can be identified with reasonable accuracy, there is still no constitutional basis for confining such persons involuntarily if they are dangerous to no one and can live safely in freedom.
>
> May the State confine the mentally ill merely to ensure them a living standard superior to that they enjoy in the private community? That the State has a proper interest in providing care and assistance to the unfortunate goes without saying. But the mere presence of mental illness does not disqualify a person from preferring his home to the comforts of an institution. Moreover, while the State may arguably confine a person to save him from harm, incarceration is rarely if ever a necessary condition for raising the living standards of those

such admission, adjournable only in accordance with subparagraph (c)(1) of this rule.

capable of surviving safely in freedom, on their own or with the help of family or friends.

    .        .        .        .        .        .        .        .

In short, a State cannot constitutionally confine without more a nondangerous individual who is capable of surviving safely in freedom by himself or with the help of willing and responsible family members or friends. [422 *U.S.* at 575–76, 95 *S.Ct.* at 2493–94, 45 *L.Ed.*2d at 406–07 (citation omitted).]

In order to justify commitment in New Jersey the State must show that an individual is likely to pose a danger to self or others or property by reason of mental illness. *State v. Krol,* 68 *N.J.* 236, 257 (1975). *See R.* 4:74–7(f); *N.J.S.A.* 30:4–23 (definition of "mental illness"). In addition to a showing of mental illness, "[c]ommitment requires that there be a substantial risk of dangerous conduct within the reasonably foreseeable future." *State v. Krol, supra,* 68 *N.J.* at 260. When commitment is necessary, we have required that

[t]he [commitment] order should be molded so as to protect society's very strong interest in public safety but to do so in a fashion that reasonably minimizes infringements upon [the individual's] liberty and autonomy and gives him the best opportunity to receive appropriate care and treatment. [*Id.* at 257–58 (footnote omitted)]

We have also required periodic review hearings to ensure that an individual's commitment continues only as long as required. *State v. Fields,* 77 *N.J.* 282 (1978); *R.* 4:74–7(f); *see Jackson v. Indiana,* 406 *U.S.* 715, 738, 92 *S.Ct.* 1845, 1858, 32 *L.Ed.*2d 435, 450–51 (1972). Further, we have provided for the conditional discharge of institutionalized persons in instances where lesser forms of restraint are sufficient to ensure the public safety and the individual's own well-being. *R.* 4:74–7(g).

As noted, in seven of these appeals, the individuals were initially determined no longer to satisfy the standards of commitment articulated in *State v. Krol, supra.* If these individuals had the capacity to exist safely in freedom, it is beyond dispute that they would be entitled to immediate release. *O'Connor v. Donaldson, supra.* Unfortunately, the appellants lack the capacity to survive independently.

■ The Task Force on Mental Commitments encourages us to expand the *Krol* standards of commitment to cover "an individual who by reason of mental illness is unable to care for himself without some level of aid or supervision." We respectfully refuse this invitation. The civil commitment process must be narrowly circumscribed because of the extraordinary degree of state control it exerts over a citizen's autonomy. *See ante* at 137–138. To widen the net cast by the civil commitment process in the manner suggested by the Task Force is inconsistent with the central purposes of the commitment process. It would permit the State to commit individuals to mental institutions solely to provide custodial care. This authority cannot be justified as a measure to safeguard the citizenry under the police power. Nor is it a proper exercise of the State's *parens patriae* power because confinement in a mental hospital is not necessary to provide the care needed by individuals who are simply incapable of living independently.[9]

■ Although the State may not commit those persons who are mentally ill but not dangerous, we believe that the State does possess certain authority in regard to these appellants. The appellants have been institutionalized for an average of over 30 years. Although legally entitled to leave the mental hospital, they are incapable of competently exercising that right due, in part, to the effects that prolonged confinement has had on their own personal capacity to survive in the outside world and on their relationships with friends and family who might provide support and assistance. The State cannot simply pull the rug from under these people when they physically deteriorate to a point where they are no longer dangerous. Although

---

[9]We note that individuals who are mentally ill, like the rest of the citizenry, are subject to the statutory procedures of guardianship, *N.J.S.A.* 3B:12–24 to –66, when shown to be mentally incompetent. In these instances, the court through the court-appointed guardian may establish the ward's place of abode, *N.J.S.A.* 3B:12–57(a), shall provide for the ward's care, comfort and maintenance, *N.J.S.A.* 3B:12–57(b), and may receive money payable from any source for the support of the ward, *N.J.S.A.* 3B:12–57(e). *See also N.J.S.A.* 3B:13A–1 to –36, *L.*1983, *c.*192 (detailing procedure for appointment and

the State does not have the authority to continue the legal commitment of the appellants, it is not required to cast them adrift into the community when the individuals are incapable of survival on their own. In a proper exercise of its *parens patriae* authority, it may therefore of necessity continue the confinement of such persons on a provisional or conditional basis to protect their essential well-being, pending efforts to foster the placement of these individuals in proper supportive settings outside the institution.

### III

Because the State necessarily retains substantial control over the individual's life and liberty in the process of arranging for appropriate placement, the individual's rights must be protected by procedures designed to minimize restrictions on the person's liberty. Such restrictions must be related to the underlying purpose of the confinement—ensuring a safe and orderly transition of the individual into an appropriate setting least restrictive of liberty.

When a court determines at a commitment review hearing conducted pursuant to *R.* 4:74–7(f) that an individual is no longer dangerous to self, others or property by reason of mental illness, the individual shall be entitled to leave the mental hospital and re-enter the community. The court, however, shall make a further inquiry to determine whether the individual is capable of leaving the institution. If the court determines that the individual is not able to survive in the community independently or with the help of family or friends, the court shall direct that the individual remain in the institution, but immediately schedule a placement review hearing to occur within 60 days. At this hearing the court shall inquire into the needs of the individual for custodial and supportive care, the desires of the individual regarding placement, the type of facility that

powers of conservator to manage the estate of "a person who has not been judicially declared incompetent but who by reason of advanced age, illness or physical infirmity, is unable to care for or manage his property or has become unable to provide for himself or others dependent upon him for support." *N.J.S.A.* 3B:13A–1 a).

would provide the needed level of care in the least restrictive manner, the availability of such placement, the efforts of the State to locate such placement and any other matters it deems pertinent. In the event that placement can be arranged in a facility able to provide the care needed in a setting not unduly restrictive of liberty, the court shall order such placement. If immediate placement is not possible, the court shall continue the individual's confinement, require that the individual be placed in the environment least restrictive of his or her liberty within the institution, and schedule a subsequent placement review hearing to occur within six months. While the individual remains confined in the institution, all reasonable efforts within available resources shall be made to improve the individual's ability to function in a placement outside the mental hospital.

At the subsequent placement review hearings, which shall occur at least every six months, the court shall inquire into the same factors as in the initial placement review as well as into the conditions of the individual's confinement. If placement is not possible, the court must determine whether the State has undertaken all good faith efforts necessary to place the individual in an appropriate setting outside the mental institution and whether in the interim the State has placed the individual in the least restrictive setting in the institution.[10] When an individual

---

[10]Due to the nature and type of evidence relevant to the placement review hearing, it is not appropriate to allocate a specific burden of proof nor define with precision the level or quality of proof required. Suffice it to say, the court has direct responsibility to be satisfied that the evidence is sufficient to support the conclusion reached. *See Jones v. United States,* —— *U.S.* ——, ——, 103 *S.Ct.* 3043, 3051, 77 *L.Ed.*2d 694 (U.S. June 28, 1983) (standard of proof in civil commitment must flexibly consider the demands of the particular situation); *In re Polk,* 90 *N.J.* 550 (1982) (burden of proof depends on nature of issues); *Mathews v. Eldridge,* 424 *U.S.* 319, 96 *S.Ct.* 893, 47 *L.Ed.*2d 18 (1976) (determination of procedural due process involves a balancing of private and governmental interests in the official action and the risks of an erroneous determination); *see also State v. Williams,* 93 *N.J.* 39 (1983) (burden of proof not allocated); *State v. Fields,* 77 *N.J.* 282 (1978) (same).

is discharged from the institution and placed in an alternate facility, the court may require as a condition of placement that a report be submitted by the parties within a six-month period as to the overall adequacy of the individual's placement. At any time thereafter, any party or the court on its own motion may reinstitute proceedings concerning the continuing care, supervision, placement or commitment of the individual.

The individual shall have the right to counsel in these proceedings. Both the individual and counsel shall be served with notice of the time and place of each placement review hearing no later than ten days prior to the hearing. The patient's counsel shall also be entitled to inspect and copy all records relating to the patient's condition and placement, to introduce evidence and compel testimony and to cross-examine adverse witnesses.

These procedural guidelines will ensure that the continuing confinement of individuals who do not meet standards for commitment and are eligible for discharge but who are unable to survive independently will be in accord with due process. However, we believe that a complete and comprehensive review of these procedural guidelines is necessary to assist the Court in amending *R.* 4:74–7. We therefore submit these issues to the Supreme Court's Task Force on Mental Commitments for its reconsideration and recommendations for rule revisions that will serve to implement this decision.

## IV

During the pendency of this appeal, the cases of four of the original appellants have become moot. *See ante* at 131 n. 2. Four of the remaining appellants—A.F., P.M., F.G., E.A.—were initially determined to be DPPs but had their status revoked at a hearing that was called to review their placement. Because the original determination that appellants were no longer com-

mitable yet in need of a supportive placement was properly entered and because the recommitment of these appellants at a placement review hearing was improper, we reverse the order continuing commitment of the appellants and remand these cases for an immediate placement review hearing.[11] The remaining appellant—J.A.—requested that she be granted DPP status at a commitment review hearing, but was refused such status because the court believed that there was no intermediate status between committed and discharged. Because we recognize today the existence of an intermediate status for those who fail to meet the *Krol* standard of commitment, we remand this case for an immediate commitment review hearing to determine whether J.A. remains committable and, if not, whether immediate release should be deferred to permit placement efforts on her behalf.

Accordingly, the appeals of S.L., R.B., C.S., and R.G. are declared moot. The cases of A.F., P.M., F.G. and E.A. are remanded for an immediate placement review hearing. The case of J.A. is remanded for an immediate commitment review hearing.

*For affirmance in part and reversal in part*—Chief Justice WILENTZ and Justices CLIFFORD, SCHREIBER, HANDLER, POLLOCK, O'HERN and GARIBALDI—7.

*Opposed*—None.

---

[11]Once it has been determined that individuals no longer meet the *Krol* commitment standard, they can be recommitted only under the commitment procedures established in *R.* 4:74–7. If during a placement review hearing a judge has reason to believe that an individual has once again become committable, the court may schedule a commitment hearing in accordance with the procedures of *R.* 4:74–7. *Cf. N.J.S.A.* 2C:4–5(a) (court may on own motion inquire into defendant's mental fitness to stand trial).