212 N.J. Super. 211 (1986)
514 A.2d 844
IN THE MATTER OF THE COMMITMENT OF S.D.
Superior Court of New Jersey, Appellate Division.
Submitted May 15, 1985.
Decided August 21, 1986.
*212 Before Judges FRITZ, GAULKIN and LONG.
Joseph H. Rodriguez, Public Advocate, for appellant S.D. (Harvard Hollenberg, Deputy Public Advocate, on the brief).
David H. Ben-Asher, Essex County Counsel, attorney for respondent Essex County Adjuster (Patrice M. Connell, Assistant County Counsel, on the brief).
The opinion of the court was delivered by FRITZ, P.J.A.D.
This is an appeal from an order which continues the involuntary commitment of S.D. at Essex County Hospital Center. The Public Advocate urges on behalf of S.D. that the record *213 made at the commitment review hearing (R. 4:74-7(f)) does not justify the continued commitment, that S.D. should be discharged pending placement (DPP) and that he should be afforded "an immediate placement review hearing" in accordance with In re S.L., 94 N.J. 128 (1983).
We are satisfied that the judgment below, although very possibly a correct one, was insufficiently bottomed on present considerations of law and so must be reversed. However, we are also satisfied that we should not enter the contrary judgment but rather that we should remand the matter for rehearing. Our determination brings into focus ethical, procedural and substantive concerns with respect to which we are somewhat limited by superior precedent but to which we now bring our best effort.
S.D. is 77 years old and has been a patient at Essex County Hospital Center since 1927. He is presently diagnosed as schizophrenic, chronic undifferentiated, with arteriosclerotic heart disease and a grossly impaired level of functioning. A Center psychiatrist, Dr. Procario, testified that S.D.'s behavior is grossly disorganized: he wanders aimlessly and frequently about the wards, picks up imaginary objects from the floor, exposes himself and masturbates publicly, continually keeps his head down and avoids eye contact and does not speak or communicate "in any meaningful way." The doctor concluded that S.D. "needs help in-patient, twenty-four hour care."
Dr. Procario further testified that S.D. hallucinates, has an "unpredictable response" to auditory hallucinations and "strikes out with no provocation." Under further inquiry as to that behavior, the doctor testified that the "[s]triking out" consisted of an aimless flailing of the arms, which S.D. does "very close to people" so that "if someone was around you they'd catch it." The doctor never observed S.D. "chase after people" or cause any "serious or permanent damage."
*214 Dr. Procario recommended that S.D.'s commitment be continued. When asked, however, whether S.D. was "a danger to himself or to others," the doctor responded as follows:
Well to himself in a sense that he's totally unable to care for himself. To others  he does strike out at people, but to my knowledge, I'm new on the case  I have not noted him causing any serious or permanent damage.
But as I said his behavior is unpredictable  I don't know how he'd be.
The trial judge interpreted the doctor's opinion to be that S.D. was not a danger to others but that he was unable to care for himself; he specifically instructed S.D.'s counsel that "we don't need cross on danger to others  there's been no opinion in that direction."
At the conclusion of the hearing, the judge ordered the commitment to continue solely because of S.D.'s inability to care for himself:
I accept the Doctor's finding that [S.D.] is practically incapable of looking after himself, feeding himself, housing himself, or otherwise surviving.
As far as it goes, the factual finding is soundly based, indeed unavoidable. But under existing law, as far as it goes, it does not support an order continuing the involuntary commitment.
S.D. may not be involuntarily committed except upon a showing that he is likely to pose a danger to himself or others or to property by reason of mental illness. S.L., 94 N.J. at 138; State v. Krol, 68 N.J. 236, 257 (1975). The showing must be of "a substantial risk of dangerous conduct within the reasonably foreseeable future." Krol, 68 N.J. at 260. Here the trial judge made no finding that S.D. is dangerous to himself, to others or to property by reason of mental illness; the sole finding which he made was that S.D. is unable to care for himself outside the institution. Despite the efforts of the Supreme Court Task Force on Mental Commitments to the contrary, that kind of inability has specifically been held not to justify an involuntary commitment. S.L., 94 N.J. at 139. While we believe that experience increasingly demonstrates the desirability of an expansion of the Krol standards, consistent with the recommendation of the Task Force, we emphasize at the outset that we *215 recognize our difference in judgment with our court of last resort does not allow us to depart from its mandate. In re Education Ass'n of Passaic, Inc., 117 N.J. Super. 255, 261 (App.Div. 1971), certif. den. 60 N.J. 198 (1972).
According conclusive weight to the findings would compel a determination here that the order continuing S.D.'s commitment was improvidently entered. Without regard for findings which perhaps should have been made and were not, on the record and the findings which were made it would appear that S.D. should have been declared discharged pending placement and entitled to placement review procedures set forth in S.L., 94 N.J. at 140-42. We will not provide that relief without a further hearing because of several serious concerns which plague us.
The first of these is substantive and is for S.D. As a result of ostensible protection of his "rights," he is threatened with being thrust from a cocoon which has sheltered him for almost 60 of his 77 years, much in the manner that a Baltimore Oriole vigorously chops the bottom from the pendulous nest and forces the baby birds out. Our other concerns are for the built-in problems which have yet to be dealt with despite the high purpose and great achievement of S.L. These are procedural matters, resoundingly reflected here.
We turn first to the purpose of commitment hearings: the rights of S.D. and his future. From the standpoint of both the individual and society the determination which results after a commitment review hearing follows consideration of sensitive and difficult problems. Inevitably these involve competing values and interests. And they center on an unexceeded societal goal: that which is called in S.L. the autonomy of a citizen. 94 N.J. at 139. Yet we strive for this Utopian achievement in the matter before us by way of a hearing which must have taken all of 10 minutes, judging from the 12 1/2-page transcript which reports it; in which two public servants  an assistant county counsel and a deputy public advocate  represented the *216 parties; in which the only medical testimony came from a doctor who, having prepared himself for this hearing by having "reviewed the chart," when asked the ultimate question respecting whether the patient was a danger to himself or to others, qualified his answer, "to my knowledge, I'm new on the case," and in which the trial judge concluded with a one sentence finding and the direction, "Continue the commitment." At risk is not only the autonomy of the citizen but his well-being. We would do more to decide rights with respect to stolen paintings, O'Keeffe v. Snyder, 83 N.J. 478 (1980), or the effect on tax obligations of a misplaced decimal point, Sabella v. Lacey Tp., 188 N.J. Super. 500 (App.Div. 1983), opinion after remand 204 N.J. Super. 55 (App.Div. 1985).
If this procedure were to turn loose on the world a person who indisputably "exposes himself and masturbates publically [sic]" simply because these activities are not thought to constitute a danger to himself, to the public or to property, S.L., 94 N.J. at 138, then, it would seem, we have exalted certain of the rights of the individual (i.e., the least restrictive or maybe even the no-confinement-at-all theory) in some deference at least to what must be characterized as new wave thinking, and this at the sacrifice of the right to be cared for. This latter right, it seems to us, is also a societal goal of the highest order. S.L. deals with it in a footnote. 94 N.J. at 139-140, n. 9.
Apart from our serious concern for the fact that S.D. indisputably needs help, it occurs to us that the evidence in the matter may not mandate an S.L. termination of the commitment. The law should hope that children of tender  or any  age, whom we protect from "R" rated moving pictures, would never witness the public masturbation. It may well be in the circumstances here presented a finding of danger to the public is not only possible but warranted.
But if the purpose of R. 4:74-7 is, as Judge Pressler observes in her comment to the Rule, to counter situations in which "persons alleged to be suffering from mental illness have been *217 involuntarily committed on ex parte orders entered without representation by counsel, without adequate notice, without adequate proofs, and generally in violation of the most fundamental concepts of due process" (Pressler, Current N.J. Court Rules, Comment R. 4:74-7 (1986 ed.) at 990), why should we be less concerned for complete due process toward protection of a right to remain committed rather than to be relegated to the never-never land of "discharged pending placement," especially since that condition is of judicial construction, "not formally recognized by any statute, administrative regulation or court rule"? S.L., 94 N.J. at 131. It is not likely that a right to remain committed  or, put another way, a right not to be discharged pending placement  will ever be more evident than it is in the matter before us, and that without regard for whether S.D. is a danger to himself or others.
What we say is neither an obloquy nor a carping with respect to S.L. Indeed, at the risk of being accused of carrying coals to Newcastle, we record our respect for the extraordinarily perceptive opinion of Justice Handler in that case. He was among the first to acknowledge that DPP exists without parentage. Commitment procedures and subsequent hearing procedures, as well as institutional procedures, are all carefully and assiduously orchestrated by statute, Rule or regulation. Recognizing the inexorability of the social trend designed to afford the utmost protection to all  and especially in these cases the sick  and the imperative of due process, the Court determined that DPP, even though not so provided for, was the best procedure yet for assuring the accomplishments of these various purposes. And it provided procedural guidelines, including the opportunity for "any party or the court on its own motion" to "reinstitute proceedings concerning the continuing care, supervision, placement or commitment of the individual." 94 N.J. at 142.
But the circumstances of this case cause us to ask, "After S.L., what?"
*218 It was the purpose of S.L. to assure to persons committed who no longer met the Krol standard for commitment, 94 N.J. at 143, their constitutional right of relief from that commitment. This "intermediate status," ibid., was there defined in terms of "individuals who are simply incapable of living independently," 94 N.J. at 139. But S.L. did not provide a standard to differentiate between those whose infirmities caused them to be "simply incapable" of living independently and those whose infirmities producing that status also impacted on the public welfare. That omission was probably because the establishment of such a standard is a Sisyphean task. Such must obviously be undertaken on a case by case basis. In that respect, in this case we return to the public masturbation and the striking out at people by S.D.
Of like import is the gray area between being "simply incapable" of living independently and being a danger to one's self. A trite but common example is the individual whose mental condition causes him or her to be unable to remember to take his medicine. It is true that a placement less confining than that of a mental institution may provide services filling this need, but that answer begs the question of whether the individual is a danger to himself. The importance of seeking an answer to that question regardless of the fact that the service may be provided elsewhere is to be found in that which we regard as a "right" of the individual to remain committed if such circumstances warrant.
These concerns cause us to opine that if we are going to have DPP  and the Supreme Court has decided that question in S.L.  the hearing must be more than a perfunctory lick and a promise. It must be meaningful, invoking sensitivity and especial astuteness on the part of the hearing judge. The concerns also demonstrate the particular necessity in cases such as these for the trial judge to comply assiduously with the mandate of Curtis v. Finneran, 83 N.J. 563, 569-570 (1980), State v. Singletary, 165 N.J. Super. 421, 424-425 (App.Div. 1979), certif. den. 81 N.J. 50 (1979), Reiser v. Simon, 63 N.J. Super. 297, *219 300-301 (App.Div. 1960) and myriad other cases pointing out the importance of findings. We do not doubt that trial judges are harried by the number of R. 4:74-7(f) hearings assigned to them day after day, many times held in the cloistered halls of the mental institution. It would come as no surprise if any of those judges became either inured or enervated by this constant, unrelieved association with the mentally deprived and their lay and medical guardians to the extent that the beleaguered judge failed to dot every "i" or cross every "t." This, however, is no reason for them or for us to forget that which is the basic teaching of S.L.: that each one in the bundle of rights of these committed persons deserves protection.
Even assuming extraordinary courtroom care, questions persist. It would appear that S.D. was alone in that courtroom with his appointed legal representative seeking freedom for S.D. from the care which made his survival possible. We accept, as we must, S.L.'s rejection of inability to care for one's self without supervision as an element justifying a continuance of commitment. But what "party" will seek review of the placement or of postplacement circumstances on behalf of S.D. if he needs it? Certainly it will not be S.D. who cannot "speak or communicate in any meaningful way." Prior to DPP and placement, the committee has the right to periodic hearings prescribed by R. 4:74-7. There is machinery in place provided by that Rule to assure the inexorability of the exercise of that right. After DPP and placement, unless there is application by "any party or the court," 94 N.J. at 142, that self-executing right simply disappears. It is entirely conceivable that S.D. could get lost forever. The condition of S.L. which permits but does not require the court to order, as a condition of placement, that a report be submitted "by the parties" within a six-month period "as to the overall adequacy of the individual's placement," ibid., may well resemble, to a limited degree at least, an asking the fox to watch over the hen house.
*220 The canon of proof, both as to the party to whom the burden belongs and the quantum of proof necessary to satisfy that burden, appears somewhat more clearly from the cases in our court of last resort and thus is somewhat easier. In a word, the burden belongs to the State to show that the individual is likely to pose a danger to self or others or to property by reason of mental illness. S.L., 94 N.J. at 138. Since the Krol fixing of the burden and the Krol standard of commitment is adopted in S.L., 94 N.J. at 138 and 143 respectively, it may be fairly presumed that its required quantum of proof will also be applied. As pointed out by Justice Clifford in his dissent in Krol, this is a "bare preponderance burden." 68 N.J. at 269.
Which brings us to a concern of ours which may implicate ethical considerations. We have little doubt that with few, if any, exceptions, counsel from the office of the Public Advocate assigned to represent the interests of the committee in these situations regards the duty imposed as one of invoking the principles of S.L. and having the "client" freed from institutional confinement. It is well enough for S.L. to suggest that those who are simply mentally ill and presumably "simply incapable of living independently," (as distinguished from those who are a danger to themselves, the public or property) have recourse in the appointment of a guardian and several statutory remedies. 94 N.J. at 139, n. 9. But on behalf of someone in the apparent position of S.D., who makes the application? If we impose that responsibility on the Public Advocate we may be building in a conflict of interest and ethical problems. A corollary of this proposition raises the question as to how much independent investigation must the assigned Public Advocates do and inquires as to whether their independent judgment should be applied in determining whether, in conjunction with their activities on the commitment review, they should petition on behalf of "clients" for the appointment of a guardian. Does the law impose upon the Public Advocate the duty of making a unilateral and independent judgment, guided, of course, by whatever expert advice is necessary, respecting whether the *221 "client" is a danger to himself or herself, the public or property? Does the law permit, much less require, the Public Advocate to make a judgment as to whether the "client's" best interest would be served by a continuing commitment? Is the Public Advocate ethically bound to report to the trial judge any conviction that the client is or very probably may be a danger in the sense of the Krol standards for commitment?
No one will disagree with the proposition that very important human rights are here concerned. We have no doubt that all those in the judicial system, from trial attorneys and trial judges to the Supreme Court, agonize over matters such as this, and without compromise, give it their best. It is our own agony here which has produced the concern expressed. But the competing policy considerations are particularly susceptible to being camouflaged by bureaucracy and financial considerations. Perhaps most terrible of all is the fact that the person most concerned  the committee  to whom we assure counsel and notice, at the very best has an imperfect understanding of what it is all about and at worst needs a guardian ad litem much more than he needs a lawyer or notice. Without any pejorative implication, we report our deep concern that the rights of S.D., and of any member of the public in his situation, hang on the slender thread of assigned attorneys whose interest, transient and most probably nonrecurrent in any one case, depends on their own personal attitudes, integrity and dedication to the profession more than on the relationship with their assigned "client"; and on the sketchy testimony of a doctor who is "newly assigned to him" and in three months has seen him just "several times" and who, when asked what he did for purposes of the hearing did not talk in terms of an interview or examination, but candidly stated, "I reviewed the chart."
S.L. is perceptive and on the cutting edge of the problem. But in our opinion it would be a mistake for appellate judges and trial judges to look on it as the final solution. We have pointed out as best we can some of the problems beyond S.L. which we perceive. The solution to some may be made manifest *222 by the sensitivity and astuteness of the trial judge on the remand of this case, in the procedure, the depth and scope of his inquiry and in his findings and conclusions. The balance may have to wait to be solved on a case by case basis.
The judgment is vacated and the matter is remanded for further proceedings not inconsistent with the foregoing.