RITA MCNESBY, GENERAL ADMINISTRATRIX AND ADMINIS-
TRATRIX AD PROSEQUENDUM OF THE ESTATE OF
CHARLES MCNESBY, DECEASED, PLAINTIFF–APPELLANT,
v. STATE OF NEW JERSEY, DEPARTMENT OF HUMAN SER-
VICES, DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued January 11, 1989—Decided March 30, 1989.

Before Judges KING, ASHBEY and SKILLMAN.

*Leo B. Dubler* argued the cause for appellant.

*Talbot Kramer,* Deputy Attorney General, argued the cause for respondent (*Cary Edwards,* Attorney General of New Jersey, attorney; *Michael R. Clancy,* Deputy Attorney General, of counsel).

The opinion of the court was delivered of

KING, P.J.A.D.

This case involves the liability and immunity of the State of New Jersey for a patient's death at the Ancora Psychiatric Hospital. We conclude that the State was immune from liability under *N.J.S.A.* 59:6–6(a)(2), governing therapeutic decisions about confining of the mentally ill, for the death of the plaintiff's decedent by suicide (self-immolation). This subsection of the Tort Claims Act specifically confers immunity for liability from claims resulting from "the terms and conditions of the confinement for mental illness." We uphold the grant of immunity and affirm summary judgment in favor of the State.

On July 20, 1984 Judge Wallace signed an order involuntarily committing Charles McNesby, the decedent, to Ancora pending a final hearing. The decedent's medical history has not been fully developed in this record but from plaintiff's complaint we know the decedent had a history of psychiatric illness. The decedent had spent a few days in Ancora in December 1977 with a diagnosis of drug-related psychotic organic brain syndrome. Hospitalized again in North Carolina in 1982, the

decedent apparently attempted suicide then and again on December 10, 1983.

After the 1983 attempt, the decedent was admitted to Cooper Medical Center in Camden. After a short stay in Cooper Medical Center, the decedent was admitted to Ancora in December 1983 and released in January 1984. The decedent again attempted suicide, an attempt that led to the commitment order of July 20, 1984 to Ancora.

When the decedent was first admitted to Ancora, suicide precautions were maintained. But on July 31, eleven days after commitment, the precautions were discontinued because the decedent's treatment team believed that "there was no indication of suicidal intent or attempt." The decedent then was transferred to a "step-up" or more open ward on August 3, 1984.

An affidavit submitted by Roberta Reyes, M.D., stated that when the decedent was first admitted, the suicide precautions required keeping him in a staff member's sight at all times. On July 31 a social worker, his nurse and his psychiatric resident reviewed the decedent's case. They determined that suicide precautions were no longer necessary and that the decedent could be transferred into a "step-up" ward for patients functioning at a higher level. The previously prescribed suicide precautions would not be used in such a ward. Pursuant to the hospital's policy, the decedent was still observed for 72 hours more before being transferred from his original "closed" or more secure ward. On August 3 the transfer was made.

Patients in the "step-up" ward were given grounds privileges. This meant unsupervised access to the hospital grounds from 11:30 a.m. to 1:30 p.m. and from 5:30 p.m. to 7:30 p.m. The decedent enjoyed those privileges between the date of the transfer to the new ward, August 3, and the date of his suicide attempt, August 12. Two days before that attempt, on August 10, the decedent appeared before the late Judge Sandman for his final hearing, contemplated by the original complaint order.

On August 10, Judge Sandman signed an order directing that the decedent be discharged "pending placement." *See R.* 4:74–7(g)(2); *In re S.L.,* 94 *N.J.* 128 (1983). Dr. Reyes's affidavit said that when patients are discharged pending placement, they are not released from the institution until suitable placement is found. Since suitable placement was not available immediately, the decedent was kept at the hospital. The complaint alleges that the decedent did not return home because his family, fearing another suicide attempt, refused to take him.

In her complaint the plaintiff claims that the State carelessly allowed the decedent to obtain gasoline from the garage area of the hospital and set himself afire. The depositions provide some factual background. One deponent, Leroy Guldin, a member of the security staff, found the decedent standing in the woods about 40 feet from the automotive pool garage. James Kaminski's deposition established that the decedent was found badly burned, but still standing, and that the decedent said he had burned himself after taking gasoline from a bus. The decedent died in Philadelphia Hospital on August 26, 1984.

The deposition of Louis Pantalone, Director of Safety at Ancora, established that the decedent was found in a "work activity" area and that there was no need for "client activity" there. Pantalone said that patients were told where they were allowed to go and where they were not. But "as far as hospital policy and signage," he was not sure whether patients with grounds privileges would actually be restricted from going where the decedent was found. Pantalone thought that common sense indicated that there were some areas where a resident with grounds privileges should not go.

Generally, the State can be held liable for negligence:

A public entity is liable for injury proximately caused by an act or omission of a public employee within the scope of his employment in the same manner and to the same extent as a private individual under like circumstances. [*N.J.S.A.* 59:2-2(a).]

But the State invokes one of many immunity provisions, *N.J.S. A.* 59:6–6:

a. Neither a public entity nor a public employee is liable for any injury resulting from determining in accordance with any applicable enactment:

(1) whether to confine a person for mental illness or drug dependence;

(2) the *terms and conditions of confinement for mental illness* or drug dependence;

(3) whether to parole, grant leave of absence to, or *release a person from confinement for mental illness* or drug dependence. [Emphasis supplied.]

Those two statutes exemplify the general theory of the Tort Claims Act: Although a public entity can be liable for the negligence of its employees, liability can be imposed only as permitted under the act.[1] Specific immunities preclude claims in those areas specified. *N.J.S.A.* 59:2–1(a); 59:2–2; 59:6–6. Any liability established by the act is subject to immunity created by the law. *N.J.S.A.* 59:2–1(b).

Plaintiff's complaint claims that "the defendants were negligent and careless in the supervision of decedent ... and of the garage area." The State claims that the plaintiff's allegations of improper supervision fall squarely within the provisions of *N.J.S.A.* 59:6–6(a). The State says that the plaintiff's claim implicates the decision to release decedent and to set the terms and conditions of his confinement while he remained in the hospital "pending placement." Hospital personnel decided to put decedent in a less restrictive environment which included two periods of totally unsupervised time. The State says that kind of discretionary medical decision commands immunity from liability. The plaintiff rejoins that she is not trying to recover because of that medical decision, but for the failure to supervise the decedent once that decision had been made.

Both parties refer to *Predoti v. Bergen Pines Cty. Hosp.*, 190 *N.J.Super.* 344 (App.Div.1983). That action was brought on the theory of a negligent transfer of a mental patient to a less restrictive setting. Originally, the plaintiff in *Predoti* had been assigned to a closed ward but, after observation, was transferred to a less restrictive open ward. *Id.* at 346.

---

[1]Plaintiff does not urge a dangerous condition of property pursuant to *N.J.S.A.* 59:4–2 as a theory of liability in this case.

Open-ward patients were permitted escorted walks on the hospital grounds. During such a walk, the plaintiff wandered from the escorted group and was injured by a car while attempting to cross the Garden State Parkway. The plaintiff settled his negligent supervision claim against the hospital and the nurses charged with supervising the walk. But the plaintiff's claim remained open to the extent that the initial decision to transfer him to an open ward constituted a negligent treatment decision. We held in *Predoti* that the decision to transfer a patient to a less restrictive setting was covered by the immunity set out in *N.J.S.A.* 59:6–6(a) and affirmed the Law Division judge's grant of summary judgment for the State. *Id.* at 347–348.

Both parties here agree that *Predoti* did not expressly resolve whether there is immunity for the negligent supervision itself. *Predoti*'s claim for damages, to the extent of that theory of action, had been settled without judicial decision. *Predoti* thus only holds that a decision to transfer to a less restrictive setting is a decision immune from liability.

The plaintiff here says she does not contend that negligence lay in the decision to transfer to a less restrictive status. The plaintiff realizes she could not recover if that were her suit's basis. Rather, the plaintiff claims that once a public entity has made the decision to transfer to a less restrictive environment, it is not immune for failing to properly supervise a patient.

The State responds that the decision to allow the decedent two blocks of unsupervised time each day was part of his treatment and a term of his confinement. This security change was designed to provide a therapeutic transition from the strict supervision originally provided to the lack of supervision anticipated upon the decedent's release into the community which, after all, a Superior Court judge had ordered two days before his suicide attempt. For that reason, the State urges, this case falls within the immunity for decisions involving "the terms and

conditions of confinement for mental illness" under *N.J.S.A.* 59:6–6(a)(2).

We agree with the State. *Predoti* says nothing contradicting our conclusion. The fact that the hospital in *Predoti* had settled a negligent supervision claim simply means the immunity question in that case and on that general theory was never resolved judicially. The absence of supervision in the case before us was an integral part of the course of treatment chosen for the decedent. The State did not simply fail to supervise decedent; it deliberately chose to provide him with unsupervised time as a method of treating him and preparing him for release to the community. The decedent still was largely supervised but a conscious medical decision was made to allow him some free time as part of his treatment. If the decedent had had a place to live outside the hospital, he would have been fully discharged, subject to no supervision by the hospital personnel.

Both parties refer to *Camburn v. Marlboro Psychiatric Hospital*, 162 *N.J.Super.* 323 (App.Div.1978), certif. granted 79 *N.J.* 476 (1979), certif.dism. 81 *N.J.* 269 (1979). In *Camburn* a patient at a psychiatric hospital escaped several times. The last time, the patient remained on the grounds for six days before he "voluntarily surrendered." Because of exposure to the cold, the patient had both legs amputated. *Id.* at 325–326. The trial judge granted a motion to dismiss the complaint because of the immunity provisions of *N.J.S.A.* 59:6–7, which protected the State from an action for an injury caused by an escaping or escaped person confined for mental illness. We refused to hold that the Tort Claims Act also immunized the State against suits for self-inflicted injuries to patients. *Id.* at 326. We held that the State could be liable under the general liability proposition set out in *N.J.S.A.* 59:2–2(a). *Id.* at 328. *Camburn* did not consider specific immunity under *N.J.S.A.* 59:6–6(a), which covers decisions concerning confinement and release.

A more recent case, *Kyriakos v. Dept. of Human Services,* 216 *N.J.Super.* 308 (App.Div.), certif. den. 108 *N.J.* 182 (1987), clarifies the relationship between an action for generally negligent supervision and a specific provision for immunity. The patient in *Kyriakos* had taken a visitor's car, driven off the hospital grounds at a high speed, and injured another motorist. *Id.* at 310. We there held that *N.J.S.A.* 59:6–7(a), which granted immunity for injury caused by an escaping person confined for mental illness, precluded recovery. We rejected the argument that the hospital was liable for alleged negligent supervision:

> The specific immunity for injuries caused by an escaping patient prevails over such a theory of liability. The statutory language neither brooks exception nor allows room for construction. The language is clear. But even if an alleged conflict in statutory language generates doubt between immunity and liability, immunity must prevail. *See Predoti v. Bergen Pines Cty. Hospital,* 190 *N.J.Super.* 344, 347 (App.Div.1983). The statute itself resolves such a conflict when it states that "any liability of a public entity established by this act is subject to any immunity of the public entity." *N.J.S.A.* 59:2–1(b). *Malloy v. State,* 76 *N.J.* 515, 519 (1978). [216 *N.J.Super.* at 311.]

Referring to *Predoti,* we approved Judge Brody's comment there regarding the difficulty and riskiness of decisions governing treatment of the mentally ill.

> Decisions affecting confinement of the mentally ill are usually highly predictive and though reasonable can lead to a demonstrably bad result. They are made even more difficult because doctors must consider the important social policy of maximizing the personal liberty of those who are mentally ill. By immunizing these difficult decisions the Legislature allows them to be made in an atmosphere free from the fear of suit. [*Predoti,* 190 *N.J.Super.* at 347–348; footnote omitted.]

We added in *Kyriakos* that: "The Legislature has clearly expressed its desire that clinical judgments to house mental patients in the least restrictive environment should not create tort liability." 216 *N.J.Super.* at 312. *See also Tarasoff v. Regents of University of California,* 17 *Cal.*3d 425, 446–449, 551 *P.*2d 334, 351–352, 131 *Cal.Rptr.* 14, 31–32 (1976).

This case presents a similar conflict in goals. Whatever the viability of an action for negligent supervision in other factual settings, we hold here that the applicable provision of the Tort

Claims Act grants immunity for this decision on "the terms and conditions of confinement for mental illness." *N.J.S.A.* 59:6–6(a)(2). While desiring a dual goal: that a mental hospital provide a safe environment where patients may exercise as much freedom as possible, we conclude that the Legislature clearly intended to immunize such decisions on terms and conditions of confinement. The decision to place the decedent on a "step-up," or more open ward, and to allow him several hours of unsupervised access to the grounds may have been foolish in terms of the dangers existing on hospital property; but, nevertheless, it was a term and condition of his confinement for which the Tort Claims Act conferred immunity.

Affirmed.