279 N.J. Super. 178 (1993)
652 A.2d 265
THE CITY OF NEWARK, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY AND BOBI RUFFIN, DIRECTOR, NEWARK DEPARTMENT OF HEALTH & HUMAN SERVICES, PLAINTIFF,
v.
J.S., DEFENDANT.
Superior Court of New Jersey, Law Division Essex County.
Decided November 8, 1993.
*184 Lauren McGlynn for plaintiff (Michelle Hollar-Gregory, Corporation Counsel for the City of Newark, attorney).
Paula Levy for defendant (Zulima Farber, Public Advocate of New Jersey, attorney).

OPINION
GOLDMAN, J.S.C.
This case presents novel issues surrounding a resurging public health catastrophe, tuberculosis (TB). It requires a review of New Jersey's TB control statute to determine if it fulfills due process requirements and if it complies with the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C.A. §§ 12101-12213. Specifically, I must decide if there is statutory authority to involuntarily commit a person with TB to a hospital and, if so, the standards and procedures that would allow such a commitment.
I hold that there is such authority and that the standards and procedures applicable to involuntary civil commitments must be followed in applications to commit persons with TB. If those procedures are scrupulously adhered to and the least restrictive means of treatment is determined, the requirements of both due process and the ADA will be fulfilled. I further hold that the procedures employed here complied with due process and the *185 ADA, and that the plaintiff, City of Newark (Newark), proved the need for J.S.'s commitment.
On October 22, 1993, Newark filed a verified complaint with the emergent duty judge and obtained a temporary commitment order and an order to show cause. Newark sought a final order "committing [J.S.] to [a local hospital] until the State Commissioner of Health shall be satisfied that the person has recovered to the extent that he will not be a menace to the community or to members of his household or that the person will so conduct himself that he will not constitute such a menace." This opinion amplifies oral findings rendered at the conclusion of the commitment hearing.[1]
The defendant, J.S., is a 40-year-old African-American male suffering from TB and HIV disease. Hospital authorities requested that Newark intervene when J.S. sought to leave the hospital against medical advice. J.S. was found dressed in street clothes, sitting in the hospital lobby. Once he wandered to the pediatrics ward. He had a prior history of disappearances and of releases against medical advice, only to return via the emergency room when his health deteriorated. Allegedly, J.S. failed to follow *186 proper infection control guidelines or take proper medication when in the hospital and failed to complete treatment regimens following his release. In March of 1993 J.S. had been discharged and deposited in a taxicab, which was given the address of a shelter to which he was to be driven. J.S. was given an appointment at a TB clinic a bus trip away from the shelter. J.S.'s Supplemental Security Income check was being delivered to another hospital, so he had no money. He did not keep his TB clinic appointment and was labeled as "non-compliant."
A sputum sample confirmed that J.S. had active TB.[2] TB is a communicable disease caused by a bacteria or bacilli complex, mycobacterium (M.) tuberculosis. One of the oldest diseases known to affect humans, it was once known as consumption or the great "white plague" because it killed so many people. Human infection with M. tuberculosis was a leading cause of death until antituberculous drugs were introduced in the 1940s. While it can affect other parts of the body, such as lymph nodes, bones, joints, genital organs, kidneys, and skin, it most often attacks the lungs. It is transmitted by a person with what is called active TB by airborne droplets projected by coughing or sneezing. When the organism is inhaled into the lungs of another, TB infection can result. Usually this happens only after close and prolonged contact with a person with active TB. Most of those who become infected do not manifest any symptoms because the body mounts an appropriate immune response to bring the infection under control; however, those infected display a positive tuberculin skin *187 test. The infection (sometimes called latent TB) can continue for a lifetime, and infected persons remain at risk for developing active TB if their immune systems become impaired.
Typical symptoms of active TB include fatigue, loss of weight and appetite, weakness, chest pain, night sweats, fever, and persistent cough. Sputum is often streaked with blood; sometimes massive hemorrhages occur if TB destroys enough lung tissue. Fluid may collect in the pleural cavity. Gradual deterioration occurs. If active TB is not treated, death is common.
Only persons with active TB are contagious. That active state is usually easily treated through drugs. Typically a short medication protocol will induce a remission and allow a return to daily activities with safety. A failure to continue with medication may lead to a relapse and the development of MDR-TB (multiple drug resistant TB), a condition in which the TB bacilli do not respond to at least two (isoniazid and rifampin) of the primary treatments, so that the active state is not easily cured and contagiousness continues for longer periods.
Death often results because it takes time to grow cultures and to determine the drugs to which the organism is sensitive. By the time that discovery is made, it may be too late, particularly for a person whose immune system has been compromised by a comorbidity such as HIV disease. For that reason a wide range of drugs, currently four or five, is tried initially while the cultures are grown and sensitivities detected, particularly if MDR-TB is suspected. Once sensitivities are discovered, medication can be adjusted so that ineffective drugs are eliminated and at least two effective drugs are always used. Medical treatment protocols have been established by the United States Centers for Disease Control and Prevention (CDC) and the American Thoracic Society. These protocols are being used for J.S. as they are for all patients under the supervision of New Jersey's Tuberculosis Control Program.
Active TB of the lungs is considered contagious and requires immediate medical treatment, involving taking several drugs. *188 Usually, after only a few days of treatment, infectiousness is reduced markedly. After two to four weeks of treatment, most people are no longer contagious and cannot transmit TB to others even if they cough or sneeze while living in close quarters. Usually exposure over a prolonged time is required, and less than thirty per cent (30%) of family members living closely with an infected person and unprotected by prophylactic drugs will become infected by the patient with active TB. On the other hand, transmission has been known to occur with as little as a single two-hour exposure to coughing, sneezing, etc., of a person with active TB. To cure TB, however, continued therapy for six to twelve months may be required. Failure to complete the entire course of therapy risks a relapse and the development of MDR-TB.
MDR-TB results when only some TB bacilli are destroyed and the surviving bacilli develop a resistance to standard drugs and thus become more difficult to destroy. This resistance may involve several drugs and directly results from a patient's failure to complete therapy. There have been no reports of TDR-TB (totally drug resistant TB) in New Jersey, so J.S. can be cured if effective drugs are found in time.
TB is more serious in persons with impaired immune systems, which can result from poor health, chronic abuse of alcohol or drugs, old age, chemotherapy for cancer, or HIV infection. Such persons are more likely to develop active TB if they already harbor the TB bacilli. By way of example, ninety per cent of persons with latent TB (these persons are neither sick nor contagious) and with an intact immune system will never develop active TB during their entire lives. On the other hand persons with HIV disease with latent TB will develop active TB at the rate of eight per cent per year.
The human immunodeficiency virus is the cause of acquired immune deficiency syndrome (AIDS). HIV infection weakens the body's natural ability to fight disease. As the immune system deteriorates, those infected with HIV may become clinically ill *189 with many serious illnesses. These are called opportunistic diseases and include pneumonia, some forms of cancer, fungal and parasitic diseases, certain viral diseases, direct damage to the nervous system, and TB. Persons infected with HIV are at much greater risk of developing active TB if they have latent TB. Once a person with HIV disease develops one of these opportunistic diseases, that person is classified as having AIDS.
New Jersey's statutory scheme for dealing with TB dates from 1912 when the predecessor to N.J.S.A. 30:9-57 was first adopted.[3] Only minor amendments have been made since 1917.[4]
This law allows me to enter an order committing a person to a hospital if he or she is "suffering from" TB and "is an actual *190 menace to the community." Notice of the hearing is required and was provided. Neither the statute nor the implementing regulation, N.J.A.C. 8:57-1.10, provides any guidance on the procedures to follow when such applications are made, nor what standards are to be used in issuing such orders. There is no case law in New Jersey providing guidance on these and many other related issues.
The regulatory schemes in other jurisdictions vary widely. Gostin, Controlling the Resurgent Tuberculosis Epidemic: A 50-State Survey of TB Statutes and Proposals for Reform, 269 J.Am.Med.Assoc. 255 (1993). There are older schemes like that in New Jersey which provide little or no guidance. There are those that provide detailed procedural details to guarantee due process while still allowing detention, isolation, quarantine, or confinement in the most extreme cases.[5]
New York City's health code amendments, 24 R.C.N.Y. § 11.47 (1993), are important because the magnitude of Newark's TB problem is exceeded only by New York City.[6] They are also notable because they recognize that other means short of isolation may be available to promote adherence to therapy regimens. They authorize the Commissioner of Health (Commissioner) to order adherence with the threat of isolation only after disobedience to less confining restrictions. 24 R.C.N.Y. § 11.47(f)(1)(iii).
Procedurally, New York provides for automatic release unless the Commissioner obtains an order permitting continued detention. 24 R.C.N.Y. § 11.47(e). Even where a person has not *191 requested release, court review and approval is required whenever detention may last more than 60 days. Id. Periodic judicial review is required in all instances, and the Commissioner must prove by clear and convincing evidence that detention is necessary. Id. Details even require assistance for those needing language interpreters and those with hearing or vision impairments. 24 R.C.N.Y. § 11.47(h).
Newark's attempt to protect the health of its citizenry is an archetypical expression of police power. Ogden v. Gibbons, 22 U.S. (9 Wheat) 1, 6 L.Ed. 23 (1824) (dicta that a state has the power "to provide for the health of its citizens" by quarantine). Cf., Jacobson v. Massachusetts, 197 U.S. 11, 25 S.Ct. 358, 49 L.Ed. 643 (1905) (compulsory vaccinations upheld against substantive due process challenge because societal interest in health can overcome individual rights). The claim of "disease" in a domestic setting has the same kind of power as the claim of "national security" in matters relating to foreign policy. Both claims are very powerful arguments for executive action. Both claims are among those least likely to be questioned by any other branch of government and therefore subject to abuse. The potential abuse is of special concern when the other interest involved is the confinement of a human being who has committed no crime except to be sick.
Due process limits police power. The Fourteenth Amendment requires "that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case." Mullane v. Central Hanover Trust Co., 339 U.S. 306, 317, 70 S.Ct. 652, 656, 94 L.Ed. 865, 873 (1950). The parameters of due process require an analysis of both the individual and governmental interests involved and the consequences and avoidability of the risks of error and abuse. Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18, 33 (1976). Here the clash of competing interests is at its peak. Hardly any state interest is higher than protecting its citizenry from disease. Hardly any individual interest is higher *192 than the liberty interest of being free from confinement. The consequences of error and abuse are grave for both the state and the individual.
The United States Supreme Court has recognized that "civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." Addington v. Texas, 441 U.S. 418, 425, 99 S.Ct. 1804, 1809, 60 L.Ed.2d 323 (1979). Our Supreme Court in In re S.L., 94 N.J. 128, 462 A.2d 1252 (1983) had occasion to collect authority on what this meant. A person has the right to notice, counsel, and must be afforded the opportunity to present opposing evidence and argument, and to cross examine witnesses. In re S.L., supra, 94 N.J. at 137, 462 A.2d 1252, citing Vitek v. Jones, 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980). Illness alone cannot be the basis for confinement. O'Connor v. Donaldson, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975). To justify confinement it must be shown that the person is likely to pose a danger to self or to others. State v. Krol, 68 N.J. 236, 257, 344 A.2d 289 (1975). The proofs must show that there is a "substantial risk of dangerous conduct within the foreseeable future." Id., at 260, 344 A.2d 289. These proofs must be shown by clear and convincing evidence. Addington v. Texas, supra, 441 U.S. at 434, 99 S.Ct. at 1813, 60 L.Ed.2d at 335. The terms of confinement must minimize the infringements on liberty and enhance autonomy. State v. Krol, supra, 68 N.J. at 257-58, 344 A.2d 289. Periodic reviews are required. State v. Fields, 77 N.J. 282, 390 A.2d 574 (1978). Lesser forms of restraint must be used when they would suffice to fulfill the government interests. In re S.L., supra, 94 N.J. at 138, 462 A.2d 1252.
Covington v. Harris, 419 F.2d 617 (D.C. Cir.1969), held that a court must satisfy itself that there were no less restrictive alternatives available to the "drastic curtailment" of rights inherent in the civil confinement of a person. Quoting Shelton v. Tucker, 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231 (1960) the court described the following "axiom of due process":

*193 Even though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved. The breadth of legislative abridgement must be viewed in the light of less drastic means for achieving the same basic purpose.
[419 F.2d at 623]
Greene v. Edwards, 164 W. Va. 326, 263 S.E.2d 661 (1980) is particularly useful in helping to decide the issues here. A writ of habeas corpus was sought following Greene's involuntary confinement pursuant to the West Virginia Tuberculosis Control Act,[7] a statute similar to, but more detailed than, N.J.S.A. 30:9-57. The West Virginia Department of Health (W. Va. DOH) filed a petition, alleging that Greene was suffering from active TB, was a health menace to others, and needed commitment. Greene was given notice of the hearing but not advised that he was entitled to counsel. Counsel was later appointed, but proceedings continued without a recess to allow Greene an opportunity to confer with his attorney.
*194 Although these proceedings conformed to the explicit statutory requirements, the court granted the petitioner's writ of habeas corpus. The court found that the statutory scheme did not meet due process requirements, which provide that no person shall be deprived of life, liberty, or property without due process of law. Greene v. Edwards, supra, 263 S.E.2d at 662.
Analogizing Greene's rights to those of a person whose commitment is sought for reasons of an alleged mental illness, the court concluded that, because "liberty is a right of the very highest nature," procedural due process safeguards already granted to those who were mentally ill should be afforded to all persons whose confinement is sought because of TB. It listed Greene's rights:
(1) An adequate written notice detailing the grounds and underlying facts on which commitment is sought; (2) the right to counsel and, if indigent, the right to appointed counsel; (3) the right to be present to cross-examine, to confront, and to represent the witnesses; (4) the standard of proof to be by clear, cogent, and convincing evidence; and (5) the right to a verbatim transcript of the proceedings for purposes of appeal.
[Greene v. Edwards, 263 S.E.2d at 663].
Greene was not released. The writ was stayed to permit new proceedings in compliance with the listed rights. Similarly, in State v. Krol, supra, 68 N.J. at 255, 344 A.2d 289, while our Supreme Court declared the statutory scheme unconstitutional, it also adopted a set of interim rules, many of which eventually became part of a subsequently enacted statutory scheme for the commitment of the mentally ill. State v. Krol, supra, 68 N.J. at 255-56, 344 A.2d 289.
The ADA also limits discrimination by government. Title II, 42 U.S.C.A. § 12131, applies the ADA to all governmental agencies. "[N]o qualified individual with a disability shall, by reason of such disability, be ... subjected to discrimination by any such entity." 42 U.S.C.A. § 12132. At first blush one might not consider involuntary confinements as subject to the ADA. Usually we think of discrimination in employment, housing, schools, transportation, public accommodations and the like. Yet for government *195 to try to confine someone based upon his or her illness alone is as wrongful an act of discrimination as denying him or her a service from government. If public entities are barred from subjecting disabled persons to discrimination, can it be seriously doubted but that they are barred from involuntarily confining them?
Whether someone with TB is disabled was answered by School Board of Nassau County, Florida v. Arline, 480 U.S. 273, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987). In Arline the primary issue was whether a person with TB could be considered a "handicapped individual" within the meaning of the Rehabilitation Act of 1973, as amended, 29 U.S.C.A. § 701. In the ADA "disability" was used by Congress instead of "handicap" to reflect currently accepted terminology. The ADA's definition of "disability" was intended to be the same as the definition of "handicapped" under the Rehabilitation Act and the Fair Housing Act. "Section-by-Section Analysis" of ADA, 56 Fed.Reg. 35,696 (1991). Thus, the Arline analysis applies to the ADA.
In Arline, a school teacher had latent TB for twenty years but then had three relapses into active TB within two years. Following her last relapse and allegedly fearful of another, the school board fired Ms. Arline. The board claimed that it was concerned about the potential risk to children if she should have another relapse. The United States joined with the school board and argued that the "mere belief that an individual is contagious  whether reasonable or not" justified the exclusion of the handicapped. The argument was that the reason for the discrimination was the fear of contagion rather than the disability. The Supreme Court responded to this argument forcefully:
We do not agree with petitioners that, in defining a handicapped individual under § 504, the contagious effects of a disease can be meaningfully distinguished from the disease's physical effects on a claimant such as this. Arline's contagiousness and her physical impairment each resulted from the same underlying condition, tuberculosis. It would be unfair to allow an employer to seize upon the distinction between the effects of a disease on others and the effects of a disease on a patient and use that distinction to justify discriminatory treatment. *196 Nothing in the legislative history of § 504 suggests that Congress intended such a result. That history demonstrates that Congress was as concerned about the effect of an impairment on others as it was about its effect on the individual.
[480 U.S. at 282, 107 S.Ct. at 1128, 94 L.Ed.2d at 317]
Allowing fears to justify adverse treatment would render § 504 meaningless and would honor the most appalling prejudice in our society. The Supreme Court explained: "[s]ociety's accumulated myths and fears about disability and disease are as handicapping as are the physical limitations that flow from actual impairment." Arline, supra, 480 U.S. at 284, 107 S.Ct. at 1129, 94 L.Ed.2d at 319. Noting the grave problem faced by Ms. Arline, the Court went on to say: "[f]ew aspects of a handicap give rise to the same level of public fear and misapprehension as contagiousness." Id. The inability to make any distinction between a disease and its contagiousness was followed in 28 C.F.R. § 35.104 (1993) which explicitly mandates that tuberculosis be deemed a disability under the ADA.
The ADA is remedial legislation designed to eliminate a long history of discrimination. 42 U.S.C.A. § 12101. Persons with HIV disease, alcoholism, epilepsy and emotional illness are equally covered, although there are unfounded myths associated with those conditions. While a person currently using illegal drugs is not "disabled," once in a rehabilitation program or once rehabilitated, he or she is covered under the ADA. 42 U.S.C.A. § 12114; 28 C.F.R. § 35.131(a)(2)(i)-(iii) (1993). A person is covered if that person has a "record" of or is "regarded" as disabled even if there is no actual disability. 42 U.S.C.A. § 12102(2)(B) and (C). Thus a person who has no clinical symptoms but is discriminated against because of latent TB is nonetheless protected by the ADA. Arline, supra, 480 U.S. at 281, 107 S.Ct. at 1127, 94 L.Ed.2d at 317; 28 C.F.R. § 35.104 (1993).
Congress intended the ADA to apply to communicable diseases when it provided that to be protected by the ADA a person must be "qualified" and defined "qualified" as one who does "not pose a direct threat to the health or safety of others ..." 42 U.S.C.A. § 12113(b). This standard of "direct threat" means that discrimination *197 is permissible only if necessary to avoid a significant risk to other persons, a risk that cannot be eliminated by a reasonable accommodation. 42 U.S.C.A. § 12111(3).
Accordingly, the ADA and its regulations require that a health officer seeking to infringe upon a diseased person's liberty by imposing detention, confinement, isolation or quarantine, must first establish, by clear and convincing evidence, that the person poses a significant risk of transmitting disease to others with serious consequences. This is not materially different from the words of N.J.S.A. 30:9-57, which requires proof that J.S. "is an actual menace to the community ..."
While opinions of public health authorities must be respected, their decisions must be based upon the latest knowledge of epidemiology, virology, bacteriology, and public health. No court can substitute its medical judgment for those authorities brought to its attention or by the evidence before it. Public health decisions must be accorded due deference, Arline, supra, 480 U.S. at 288, 107 S.Ct. at 1131, 94 L.Ed.2d at 321 ("[C]ourts normally should defer to the reasonable medical judgments of public health officers.") Nonetheless, such deference is not appropriate if those powers are exercised in an "arbitrary, unreasonable" manner. Jacobson, supra, 197 U.S. at 28, 25 S.Ct. at 362, 49 L.Ed. at 650. Courts must guard against the risk that governmental action may be grounded in popular myths, irrational fears, or noxious fallacies rather than well-founded science.[8]
The isolation of the chronically ill and of those perceived to be contagious appears across cultures and centuries, as does the development of complex and often *198 pernicious mythologies about the nature, cause and transmission of illness. Tuberculosis is no exception.
[Arline, supra, 480 U.S. at 284, 107 S.Ct. at 1129, 94 L.Ed.2d at 319, n. 12].
The best way to guard against such risks is to demand an individualized, fact-specific determination as to the person under consideration. This is the key to all decision-making under the ADA. As explained by the 11th Circuit decision which Arline, supra, affirmed:
The court is obligated to scrutinize the evidence before determining whether the [government's] justifications reflect a well-informed judgment grounded in careful and open-minded weighing of the risks and the alternatives, or whether they are simply conclusory statements that are being used to justify reflexive reactions grounded in ignorance or capitulation to public prejudice.
[Arline v. School Board of Nassau County, 772 F.2d 759, 765 (11th Cir.1985).]
Thus proof that this specific person (and not similar persons) poses a significant risk to others, a risk that may not be merely speculative, theoretical, remote or even "elevated," is required. H.R.Rep. No. 485, 101st Cong., 2d Sess., pt. III (Report of the Judiciary Committee) at 51 (1989), U.S.Code Cong. & Admin.News 1990, pp. 267, 474. In addition, the least restrictive means should be used to achieve the clearly defined public health goal. This is precisely what, in this context, "reasonable accommodation" means within the ADA. 42 U.S.C.A. § 12111(3) (only those significant risks which cannot be eliminated by reasonable accommodation can be considered "direct threats"). "A person who poses a significant risk of communicating an infectious disease to others in the workplace will not be otherwise qualified for his or her job if reasonable accommodation will not eliminate that risk." Arline, supra, 480 U.S. at 287, 107 S.Ct. at 1131, 94 L.Ed.2d at 320, n. 16.
N.J.S.A. 30:4-27.1 to -27.23 was adopted in 1987 to codify much of what State v. Krol, supra, 68 N.J. 236, 344 A.2d 289, State v. Fields, supra, 77 N.J. 282, 390 A.2d 574, and Addington v. Texas, supra, 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323, required. That statute provides a comprehensive set of procedures and standards reflecting modern ideas of mental health treatment and modern concepts of constitutional law. See Senate Revenue, Finance and *199 Appropriations Committee Statement on Assembly Bill No. 1813 (L. 1987 c. 116).
Some provisions establish procedures to enhance fairness and to reduce the risks of error and abuse. Persons whose confinement is sought must be provided counsel. R. 4:74-7(c). Such persons are entitled to adequate notice of the hearing (N.J.S.A. 30:4-27.13(a)) and discovery before the hearing. R. 4:74-7(d); N.J.S.A. 30:4-27.13. The hearing must be held expeditiously to avoid unnecessary confinement. R. 4:74-7(i); N.J.S.A. 30:4-27.12. The hearing must be held in camera if requested to protect privacy interests. N.J.S.A. 30:4-27.14e. Prior to the hearing an independent examination paid for by the committing authority must be provided upon request. R. 4:74-7(d). The person sought to be confined has the right to be present, to cross-examine witnesses and to present testimony. N.J.S.A. 30:4-27.14(b)-(d); R. 4:74-7(e). The hearing must be on the record. R. 1:2-2. Evidence must be under oath. N.J.R.E. 603. Periodic court reviews are mandated. N.J.S.A. 30:4-27.16. All proofs must be shown by clear and convincing evidence. N.J.S.A. 30:4-27.15a.
There are additional requirements. Illness alone cannot be a basis for involuntary commitment. In re S.L. 94 N.J. 128, 137-138, 462 A.2d 1252 (1983). Persons may not be confined merely because they present a risk of future conduct which is socially undesirable. State v. Krol, supra, 68 N.J. at 259, 344 A.2d 289. A court must find that the risk of infliction of serious bodily injury upon another is probable in the reasonably foreseeable future. N.J.S.A. 30:4-27.2i. State v. Krol, supra, 68 N.J. at 260, 344 A.2d 289 explains more. History, actual conduct and recent behaviors must be considered. Dangerous conduct is not the same as criminal conduct. Dangerous conduct involves not merely violations of social norms but significant injury to persons or substantial destruction of property. The evaluation of the risk involves considering the likelihood of dangerous conduct, the seriousness of the harm that would ensue if such conduct took place, and its probability within the reasonably foreseeable future. *200 A person's past conduct is important evidence of future conduct. If a person is only dangerous with regard to certain individuals, the likelihood of contact with such individuals must be taken into account.
As shown earlier, many commentators have suggested that the most apt analogy for commitments for medical reasons is the model of civil commitments for mental illness. This was the analogy seized upon by the West Virginia Supreme Court in Greene, supra, 263 S.E.2d 661. Professor George J. Annas recently similarly referred to the problem of TB:
The closest legal analogy is provided by court cases that have reviewed the constitutionality of state statutes permitting the involuntary commitment of mental patients on the basis that they have a disease that causes them to be dangerous.
[Annas, Control of Tuberculosis  The Law and the Public's Health, 328 New Eng.J. of Med. 585, 586 (1993).]
It ought not be surprising that whatever may be the source, the conclusion is very much the same. The constitutional concept of due process is designed to prevent irrational discrimination by ensuring a forum that can hear opposing perspectives and by insisting that distinctions are rationally based.
The decisive consideration where personal liberty is involved is that each individual's fate must be adjudged on the facts of his own case, not on the general characteristics of a "class" to which he may be assigned.
[State v. Krol, supra, 68 N.J. at 255, 344 A.2d 289.]
Similarly, the ADA is designed to avoid the risk of stereotyping, bigotry and prejudice by demanding an individualized determination before any adverse action is taken against a person with any disability. Finally, New Jersey laws regulating civil commitments are designed to meet due process demands, yet provide a mechanism for these unusual cases where public safety demands commitment.
Gostin also explains the synthesis between constitutional adjudication, the ADA, and the mental illness analogy. Gostin, supra, *201 289 J.Am.Med.Assoc. at 258-259. He refers to the problem of forcing directly observed therapy (DOT) under the ADA:[9]
Consequently, health departments should use compulsory DOT only as a last resort; conceptually, it should be used as a less restrictive alternative to isolation or commitment. Directly observed therapy without the person's consent should be based on an individualized determination that the person is unable or unwilling to comply with the plan of treatment and poses a significant risk of transmission. Generalizations or stereotypes about the person's class or status such as being poor, homeless or a drug user would not provide a sufficient basis for DOT without consent. Objective evidence of noncompliance, such as recent behavior, would be required under the significant risk standard [of the ADA].
Thus, it becomes possible to reconcile public health concerns, constitutional requirements, civil liberties, and the ADA all simultaneously. Good public health practice considers human rights so there is no conflict. Since coercion is a difficult and expensive means to enforce behaviors, voluntary compliance is the public health goal. Compliance is more likely when authorities demonstrate sensitivity to human rights. "Society achieved a precarious understanding in the HIV epidemic that respect for human rights was required in order to protect the public health." Gostin, supra, 289 J.Am.Med.Assoc. at 259.
That these interests are reconcilable does not mean that any one case will be easy to reconcile. Any individualized balancing process is a challenge. But it does mean that the principles by which that process is governed can be made clear and without conflict or contradiction. Moreover, to the extent that current laws regarding the commitment of those with TB are so ancient that they fail to meet modern standards of due process or the mandates of the ADA, it is the responsibility of our courts to *202 ensure that there are procedures to ensure the rights of individuals whose proposed confinement invokes the judicial process. State v. Krol, supra, 68 N.J. 236, 344 A.2d 289; State v. Fields, supra, 77 N.J. 282, 390 A.2d 574; Greene v. Edwards, supra, 263 S.E.2d 661. There is no need to declare the New Jersey TB control statute (N.J.S.A. 30:9-57) unconstitutional so long as it is interpreted to be consistent with the Constitution. There is no reason to find it in violation of the ADA so long as it is interpreted to be consistent with the ADA. It must be remembered that this statute was first enacted in 1912, yet it had provisions requiring notice and a judicial hearing. The statute required proof that the person be "an actual menace to the community or to members of his household." The Legislature intended to permit the confinement of someone with TB but only under circumstances consistent with due process. Many of the rights we now recognize were unheard of in 1912. The ADA did not exist. Declaring the statute unconstitutional and leaving citizens of New Jersey with no shield against the rare person with TB who poses a true significant risk to others would be the true frustration of legislative intent. Therefore I construe N.J.S.A. 30:9-57 so as to include those rights necessitated by contemporary standards of due process and by the ADA. Such a construction effectuates the legislative intent.
The first step of the individualized analysis required here is to define precisely what Newark seeks. During the active phase of TB, isolation of J.S., as opposed to confinement or imprisonment, is what is required. If J.S. lived in a college dormitory with other roommates, different quarters would have to be found for him. If J.S. lived in a private home and could be given a private bedroom or others in the household could be given prophylactic antibiotic therapy, confinement to his own home might be appropriate. J.S. is homeless, and a shelter where he would risk infecting others, including those with impaired immune systems, would probably be the worst place for him to stay. Brudney and Dobkin, Resurgent Tuberculosis in New York City: *203 Human Immunodeficiency Virus, Homelessness, and the Decline of Tuberculosis Control Programs, 144 Am.Rev. of Respiratory Dis. 745 (1991); McAdam, The Spectrum of Tuberculosis In a New York City Men's Shelter Clinic, Chest (April, 1990); Torres, et al., Human Immunodeficiency Virus Infection Among Homeless Men in a New York City Shelter: Association with Mycobacterium Tuberculosis Infection, 16 Annals of Internal Med. (Oct. 1990).
Because active TB can be serious and can be potentially contagious by repeated contact, there are few options for the homeless with active TB.[10] As Professor Annas said:
Although these safeguards [constitutional rights] may seem impressive, in fact the only issues likely to concern a judge in a tuberculosis commitment proceeding are two factual ones: Does the person have active tuberculosis, and does the person present a danger of spreading it to others? Since it is unlikely that any case will be brought by public health officials when the diagnosis is in doubt, the primary issues will be the danger the patient presents to others and the existence of less restrictive alternatives to confinement that might protect the public equally well.
[Annas, supra, at 328 New Eng.J. of Med. 586.]
I find that the answers to the questions posed by Professor Annas have been provided by Newark and have been established by clear and convincing evidence. There is no question but that J.S. has active TB. There is no question but that he poses a risk to others who may be in contact with him, particularly in close quarters. Because he is homeless, there is no suggestion of any other place he could stay that would be less restrictive than a hospital.
The hearing I conducted was designed to comport to all the requirements of due process and with all the requirements of a commitment hearing under N.J.S.A. 30:4-27.1 to -27.23. I believe my conclusions also satisfy the ADA and Arline, that judicial decisions in this area be based upon, "(a) the nature of the risk *204 (how the disease is transmitted), (b) the duration of the risk (how long is the carrier infectious), (c) the severity of the risk (what is the potential harm to third parties), and (d) the probabilities the disease will be transmitted and will cause varying degrees of harm." 480 U.S. at 288, 107 S.Ct. at 1131, 94 L.Ed.2d at 321.
I find that J.S. presents a significant risk to others unless isolated. Hospital confinement is the least restrictive mode of isolation proposed to me. The only request at this time is that J.S. be confined until he has shown three negative sputum tests[11] demonstrating that his TB is no longer active. This is narrow, limited, and very reasonable, but because the time period for treatment is indefinite, I will initially set an initial court review to be held in three weeks, on Tuesday, November 30, 1993, at 1:30 p.m., unless J.S. has earlier been determined to have gone into remission from active TB. In that event J.S. will be released immediately unless Newark seeks confinement for another reason.
At the November 30, 1993, hearing, Newark will have the burden of proving the need for further confinement; however, unless there is a change in condition, I will consider the evidence presented on November 8, 1993 along with whatever updates may be necessary. Only updated information need be presented. If there is no change, then the current order will likely continue. Obviously J.S. will also have the opportunity to present evidence; however, discovery shall be provided by each side to the other and to me at least one week in advance of the hearing date.
In the interim I will utilize the well-established procedures New Jersey has in place for civil commitments of the mentally ill. N.J.S.A. 30:4-27.1 to -27.23; R. 4:74-7. Although some procedures may not apply to the confinement of those with contagious diseases like TB, until and unless a more specific law is enacted, the only available and constitutional mechanism is to use *205 these tested mental health statutes, court rules, and the case law thereunder. This is certainly preferable to declaring N.J.S.A. 30:9-57 unconstitutional and leaving no authority whatsoever to fulfill an essential public police power.
Thus, the order of commitment will incorporate by reference the patient's rights as set forth in the laws regarding civil commitments, to the extent feasible and practical. Those provisions relating only to mental health issues need not apply. N.J.S.A. 30:4-27.11d(c) explains that rights that are medically contraindicated may be avoided if there are proper written orders by J.S.'s physician. For example, the provisions regarding the opportunities to see visitors must be accomplished according to established hospital procedures for infection control. His right to outdoor activities may have to be curtailed if he refuses to wear his mask. The hospital may not have safe and suitable facilities for extended visits with persons of the opposite sex. I will not interfere with medical judgment, but I will remain available on short notice to resolve any disputes.
Newark also wanted J.S. ordered to provide sputum samples and take his medication as prescribed. The testimony was that a forced sputum sample requires a bronchoscopy, a procedure involving sedation and requiring separate informed consent because of its risks. No facts were shown to justify such a diagnostic procedure where it might cause harm to J.S. As to continued treatment, testimony showed that the medications were quite toxic, dangerous, and some required painful intramuscular administration. J.S. is being asked to take many pills causing numerous side effects, including nausea and pain. The efficacy of the drugs will be unknown until receipt of sensitivity reports.
These facts cannot justify a remedy as broad as Newark seeks. J.S. has the right to refuse treatment even if this is medically unwise. Matter of Farrell, 108 N.J. 335, 347, 529 A.2d 404 (1987) (people have the right of self-determination regarding their own bodies). He must remain isolated until he is no longer contagious. Contagiousness cannot be assessed unless he gives sputum samples. *206 While he can refuse to provide sputum samples and refuse bronchoscopy, his release from isolation may be delayed, as he will be unable to satisfy the conditions of release. The same is true with his refusal to take medication. If he refuses, he may not get better. If J.S. continues to suffer from active TB, he will be unable to satisfy the conditions of release.
On the other hand if J.S. cooperates with his caregivers, provides sputum samples, and takes his medication willingly, then upon his improvement, Newark will have a difficult time proving that he needs confinement because he is not cooperative.[12] His in-hospital conduct will go a long way towards demonstrating his ability to follow medical therapy once released and will be considered if after his active TB is cured, J.S.'s confinement is sought because his alleged failure to follow continued therapy will make him a future risk.[13] I would then have to consider an order analogous to those permitted under N.J.S.A. 30:4-27.15c, which would simply require J.S. to take his medication.[14]
NOTES
[1] On November 8, 1993, I heard the return of the order to show cause, which was a commitment hearing. Newark's application was then limited to seeking J.S.'s confinement while he was receiving treatment for active TB. J.S. opposed any confinement and was represented by counsel.

This hearing was conducted in chambers so that a speaker telephone could enable all those present to be heard by those in the hospital. A similar device was set up in J.S.'s hospital room. A court reporter was able to listen to and record the testimony from both sites. Most witnesses, including J.S.'s admitting physician, a pulmonary disease specialist, social worker, floor nurse, infectious control nurse, and the hospital vice-president and chief of social work, all testified from J.S.'s room. One witness, Kenneth Shilkret, Chief of the Tuberculosis Control Program of the New Jersey Department of Health, testified in chambers. All witnesses were sworn and cross-examined by J.S.'s counsel. Throughout the hearing J.S. interrupted proceedings to demand an opportunity to present his "side," but his counsel properly wanted to wait until Newark finished its presentation. When it was J.S.'s turn to testify, he refused to do so and voluntarily absented himself from further proceedings, which then consisted of my decision that was then rendered in open court.
[2] Whether a person has active TB and is infectious can be determined by analyzing a smear of sputum (a substance expelled from the lungs) by staining the smear (for immediate analysis) or by culturing the bacilli (which can take longer but is more sensitive). Chest x-rays may reveal the presence of disease but not its contagiousness. Glassroth, Robins & Snider, Tuberculosis in the 1980s, 302 New Eng.J.Med. 1441-43 (1980). Unless set forth otherwise, the sources for the medical information in this opinion were the expert testimony before me and the contents of U.S. Congress, Office of Technology Assessment publication, The Continuing Challenge of Tuberculosis, OTA-H-574 (September, 1993).
[3] The 1912 statute provided: "11. If any person fails to obey any of said rules or regulations ["for the care of persons suffering from tuberculosis, and for the prevention and spread of such disease"], the offender may be committed to the county hospital by any judge of the Court of Common Pleas...." In L. 1917, c. 172, provisions requiring two days' notice of the time and place of the hearing were required to be served on the person whose commitment was sought.
[4] N.J.S.A. 30:9-57 provides: "A person with communicable tuberculosis who fails to obey the rules or regulations promulgated in accordance with R.S. 26:4-70 by the State Department of Health for the care of tubercular persons and for the prevention of the spread of tuberculosis, or who is an actual menace to the community or to members of his household, may be committed to a hospital or institution, designated by the State Commissioner of Health with the approval of the Commissioner of Human Services for the care and custody of such person or persons by the Superior Court, upon proof of service upon him of the rules and regulations and proof of violation thereafter, or upon proof by the health officer of the municipality in which the person resides, or by the State Commissioner of Health or his authorized representative, that he is suffering from tuberculous, and is an actual menace to the community, or to members of his household. Two days' notice of the time and place of hearing shall in all cases be served upon the person to be committed. Proof of such service shall be made at the hearing. The court may also make such order for the payment for care and treatment as may be proper. The superintendent or person in charge of said hospital or institution to which such person has been committed shall detain said person until the State Commissioner of Health shall be satisfied that the person has recovered to the extent that he will not be a menace to the community or to members of his household or that the person will so conduct himself that he will not constitute such a menace."
[5] Isolation and quarantine are similar. "Isolation" means isolation of the infected while "quarantine" means isolation of the healthy who have been exposed to the infected but who are not yet ill themselves. Confinement and commitment are techniques to accomplish the desired isolation. Detention is a temporary commitment.
[6] Former HHS Secretary Joseph Califano colorfully describes the synergy of plagues affecting New York City in Three-Headed Dog from Hell: The Staggering Public Health Threat Posed by AIDS, Substance Abuse and Tuberculosis, Wash. Post, December 21, 1992, at A22. The City of Newark has been similarly ravaged.
[7] W. Va. Code § 26-5A-5 provides: "If such practicing physician, public health officer, or chief medical officer having under observation or care any person who is suffering from tuberculosis in a communicable state is of the opinion that the environmental conditions of such person are not suitable for proper isolation or control by any type of local quarantine as prescribed by the state health department, and that such person is unable or unwilling to conduct himself and to live in such a manner as not to expose members of his family or household or other persons with whom he may be associated to danger of infection, he shall report the facts to the department of health which shall forthwith investigate or have investigated the circumstances alleged. If it shall find that any such person's physical condition is a health menace to others, the department of health shall petition the circuit court of the county in which such person resides, or the judge thereof in vacation, alleging that such person is afflicted with communicable tuberculosis and that such person's physical condition is a health menace to others, and requesting an order of the court committing such person to one of the state tuberculosis institutions. Upon receiving the petition, the court shall fix a date for hearing thereof and notice of such petition and the time and place for hearing thereof shall be served personally, at least seven days before the hearing, upon the person who is afflicted with communicable tuberculosis, and that such person is a source of danger to others, the court shall commit the individual to an institution maintained for the care and treatment of persons afflicted with tuberculosis ..."
[8] That these fears are real is explained by Susan Sontag in Illness as Metaphor (1978), which collected the literature on TB, thought "to be an insidious implacable theft of a life." She explains how the hero's mother in Stendahl's Armand (1927) refuses to say "tuberculosis" because she fears that simply uttering the word will make her son sicker. Ms. Sontag explains further that TB has been used as a metaphor for all that is "unqualifiedly and unredeemably wicked.... Hitler, in his first political tract, an anti-semitic diatribe written in September 1919, accused the Jews of producing a `racial tuberculosis among nations.'" Sontag, supra, at 5-7, 9, 13, 15-16, 19, 38, 44, 61-62, 83.
[9] Directly observed therapy (DOT) is a controversial system by which therapy is assured by having medication taken when the patient is directly observed by a health care worker. This can occur by having the worker go to the patient's home or by having the patient come to a treatment site for medication. For patients who no longer have active TB, continued therapy is the true public health goal. In those cases confinement is merely the most extreme and drastic of mechanisms to assure that medicine is taken. Because therapy may only be required two or three times a week, it is easy to understand why confinement is so drastic a remedy.
[10] The defendant has not argued here that some state action has caused his homelessness and put him in the very position that results in the need for confinement. If J.S. would suggest some other alternative to hospitalization that would impose less restrictions but would achieve the same public health objective, then Newark would have the burden of showing why this less restrictive alternative was not selected.
[11] Confirmed by the opinion of J.S.'s physician that he is clinically improved. This is the long time standard of the CDC Guideline for the Prevention of TB Transmission in Hospitals, HHS Publication No. (CDC) 82-8371 at 5 (1982).
[12] In order to fulfill the requirement of using the least restrictive alternative, public health officials will usually have to show that they attempted step-by-step interventions, beginning with voluntary DOT, supplemented by incentives (e.g., food or money as a reward for taking medication) and enablers (e.g., travel assistance). Commitment is an absolute last resort.
[13] The CDC in its Morbidity and Mortality Weekly Report of February 5, 1993, report on the South Carolina experience, which suggested that "non-adherent" patients can be treated without confinement. On the other hand, the New York City experience shows that "even an approach as intense as confinement does not ensure that patients will be cured."
[14] This is precisely what subsequently happened here. At the November 30, 1993, review hearing, Newark presented additional expert testimony and J.S.'s updated medical records showing the situation unchanged. But thereafter, J.S. began to take his medication faithfully and his active TB was arrested. On January 10, 1994, J.S. was released from confinement pursuant to a consent order in which he agreed to DOT and agreed to being committed again if he failed to take his medicine. This consent order was approved in open court in J.S.'s presence as there was no longer any need for isolation once he no longer suffered from active TB.