896 A.2d 495 (2006)
385 N.J. Super. 151
In the Matter of the COMMITMENT OF M.C.
In the Matter of the Commitment of C.H.
Superior Court of New Jersey, Appellate Division.
Argued January 19, 2006.
Decided April 24, 2006.
*496 Theodore S. Novak, Deputy Public Defender, argued the cause for appellants *497 (Yvonne Smith Segars, Public Defender, attorney; Mr. Novak, on the brief).
Laura J. Paffenroth argued the cause for respondent (Office of the Camden County Adjuster, attorneys; Ms. Paffenroth, on the brief).
Before Judges STERN, GRALL and MINIMAN.
The opinion of the court was delivered by
GRALL, J.A.D.
M.C. appeals from an order of January 4, 2005, placing her on continued extension pending placement (CEPP) after a review hearing on her initial commitment. She was released on January 19, 2005, to return to the home she shares with her husband. C.H. appeals from an order of January 19, 2005, placing him on CEPP at the conclusion of an initial hearing on his civil commitment. He was released later the same day to his parents' home.
M.C. and C.H. both contend that the judge erred in extending their commitments pending placement. We heard argument in both cases on February 4, 2005, and now consolidate the appeals.
The cases demonstrate that there is a need to address the legal standards that govern a judge's discretion to extend a patient's commitment pending placement pursuant to R. 4:74-7(h)(2). Although the state argues that the appeals are moot, it is proper to address the claims, regardless of potential consequences; the important issues raised are likely to arise again in cases that will be mooted before appeal. In re Commitment of N.N., 146 N.J. 112, 124, 679 A.2d 1174 (1996); see In re Commitment of P.D., 381 N.J.Super. 389, 391, 886 A.2d 208 (App.Div.2005), certif. granted and remanded, 186 N.J. 251, 893 A.2d 719 (2006).
The following is a summary of the evidence and the judge's findings and conclusions with regard to C.H. He was temporarily committed to the Camden County Health Services Psychiatric Center from a screening center on December 31, 2004. Consistent with the requirements of N.J.S.A. 30:4-27.12a, a hearing on the question whether C.H. was a person in need of civil commitment was scheduled for January 19, 2005. C.H. was thirty-two years of age at the time of the hearing. He had lived with his parents all of his life.
The state did not present any evidence about C.H.'s mental illness or the circumstances that led to his temporary commitment. Dr. Wayslow, C.H.'s attending psychiatrist, was of the opinion that he did not currently present a danger to self, others or property by reason of mental illness. Nonetheless, he recommended CEPP subject to "appropriate placement" and conditioned upon his taking prescribed medication, attending monitoring appointments and participating in an outpatient program for mentally ill chemical abusers and a partial care program. C.H. consented to the conditions other than CEPP and requested immediate discharge to his parents' home.
C.H.'s mother, who attended the hearing, advised the judge that her son could return home on a temporary but not a permanent basis, for a period of "no more than three months." C.H. explained that he had applied for housing through the local Mental Health Center and understood that the Center would find him an apartment or a room in Gloucester County, preferably one room. His mother explained that the placement "was supposed to be more in a group home that would be supervised" and that there would be "programs, someone to help him find a job, ... a day-care program, if necessary, but not living in an apartment on his own...." *498 C.H. explained that pending an arrangement through the center, he planned to reside with his parents. In Dr. Wayslow's opinion, the residence of C.H.'s parents was an "appropriate placement." The judge asked Dr. Wayslow if it would also be "appropriate for C.H. to reside in an apartment by himself." Dr. Wayslow said he had not considered C.H.'s living in an apartment and would want to know more about it before deeming it appropriate. He did not articulate his concerns.
The judge ruled:
I'm willing to order and I'm going to order CEPP. I'm not going to order discharge with conditions today. I'm not satisfied there is an appropriate placement for the next ninety days right this minute.... We're going to review the matter in two weeks, and hopefully in two weeks we're going to be able to investigate this and come up with a final placement solution.
When the state's attorney asked whether the judge wanted additional testimony about placement, he said he did not. He explained that the doctor had not considered the question and could testify about it in two weeks, unless C.H. was discharged in the interim, which would obviate the need to consider the matter.
The judge also denied a request from C.H.'s attorney to question C.H.'s mother about her willingness to house C.H. for the next ninety days. The judge said he was not making a determination that C.H. had no place to live for the next ninety days.
C.H.'s attorney asked the trial judge to clarify the ruling:
DEFENSE COUNSEL: Is the Court making a determination that he has no place to live at this point?
THE COURT: No. No, I'm not. Absolutely not.
DEFENSE COUNSEL: And there being no finding of dangerousness, the court is keeping him in the hospital.
THE COURT: Because the mother hasn't indicated that she's willing to take [C.H.] for [more than] the next 90 days.
....
THE COURT: She said not more than 90 days.
The following is a summary of the evidence and the judge's findings and conclusions with regard to M.C. She was admitted by order of temporary commitment to the Camden County Health Services Psychiatric Center on November 13, 2004. Prior to her admission, she had lived with her husband in a home they owned in Camden. Consistent with the requirements of N.J.S.A. 30:4-27.12a, a hearing on the question whether M.C. was a person in need of civil commitment was held on November 30, 2004. At the conclusion of that hearing, the judge continued her commitment until a review hearing was held on January 4, 2005. M.C. was fifty-nine years of age at the time of the review hearing.
Dr. Wayslow, M.C.'s attending psychiatrist, was of the opinion that she did not currently present a danger to self, others or property by reason of mental illness. Nonetheless, he recommended CEPP subject to "appropriate placement" and conditioned upon her taking prescribed medication, attending monitoring appointments and cooperating with clinical case management services.
Although M.C. agreed to all other conditions, she wanted to return to her husband and the home they owned. Dr. Wayslow reported that he had spoken with M.C.'s husband, who was unwilling to have M.C. return home until she was stabilized on medication, preferably "injectable medication." M.C. had received one injection and the second dose was due within two *499 weeks. Dr. Wayslow elaborated on M.C.'s husband's position: "he has a cardiac condition, and we were going to see about getting her the second injectable medication and then ... trying to get her stabilized with that second dose of medication and then discharging her after that." The doctor acknowledged that M.C. could receive the medication on an outpatient basis and would not be a danger to herself or someone else if she were discharged that day to return home. He was concerned about M.C.'s compliance because of her history of discontinuing oral medications and treatment in the past. He reported that M.C.'s non-compliance contributed to her present hospitalization.
When asked whether M.C. was sufficiently stable to live on her own or required support, Dr. Wayslow said only that she would benefit from support. He did not indicate that she needed such support. Indeed, during the course of the hearing, the doctor changed his opinion and concluded that based on everything he knew, M.C. could be released to her home that day.
M.C.'s social worker warned that the local mental health center would "not guarantee" that M.C. could be seen within two weeks and said that he could secure an appointment within thirty days. M.C. reported that she had a psychiatrist outside the hospital, Dr. Chang, who worked with a community mental health center in Camden. She agreed to continue taking her medication by injection: "I know that I have to and I'll take it." She agreed to cooperate with case management and explained that her husband had visited her two days earlier and that they had gotten along well.
M.C.'s attorney argued that she was entitled to discharge; because the evidence did not establish that she posed a danger to her husband, she had a right to return to her home.
The trial judge found and concluded:
I don't disagree with what you say, [counsel]. However, inin this particular case, I'm going to order CEPP for [M.C.]. I'm concerned that her going home could be both a danger to herself and to her husband, not in perhaps the classic sense of she would do something physically to her husband, but under the totality of the circumstances, I believe that CEPP is appropriate. The conditions will continue for ninety days. I'm going to review this matter in two weeks.
He also noted that the hospital staff could discharge M.C. administratively as soon as the following day. But, M.C. was not released until fifteen days later.
Our review begins with the substantive limitations on a judge's authority to order continued confinement under the civil commitment law, N.J.S.A. 30:4-27.1 to -27.23. The interference with a patient's liberty that civil commitment entails is justified on the basis of the state's interest in confining and treating "an individual [who] is likely to pose a danger to self or others or property by reason of mental illness." In re Commitment of S.L., 94 N.J. 128, 138, 462 A.2d 1252 (1983). "[A] State cannot constitutionally confine without more a nondangerous individual who is capable of surviving safely in freedom by himself or with the help of willing and responsible family members or friends." O'Connor v. Donaldson, 422 U.S. 563, 576, 95 S.Ct. 2486, 2494, 45 L.Ed.2d 396, 407 (1975). Because the patient's liberty is at stake at all stages of a commitment proceeding, "meticulous adherence to statutory and constitutional criteria" for commitment is required. In re Commitment of D.M., 285 N.J.Super. 481, 486, 667 A.2d *500 385 (App.Div.1995), certif. denied, 144 N.J. 377, 676 A.2d 1092 (1996).
Pursuant to N.J.S.A. 30:4-27.12a and R. 4:74-7(f)(1), a court may authorize involuntary commitment if the state proves by clear and convincing evidence that a patient is "in need of involuntary commitment." Persons in need of involuntary commitment are those who are: mentally ill, within the meaning of N.J.S.A. 30:4-27.2r; dangerous to self, others or property, within the meaning of N.J.S.A. 30:4-27.2h, i; and unwilling to be admitted for voluntary receipt of services that are unavailable elsewhere, within the meaning of N.J.S.A. 30:4-27.2m. See R. 4:74-7(f)(1); P.D., supra, 381 N.J.Super. at 394, 886 A.2d 208.
If the state fails to establish each element essential to authorize further restrictions on the patient's liberty, the general rule requires discharge upon completion of discharge plans within forty-eight hours. N.J.S.A. 30:4-27.15b. The importance of the general rule that entitles a patient to discharge when he or she is no longer in need of commitment cannot be minimized; it protects the patient's right to freedom from unconstitutional confinement.
There are two narrow exceptions to the general rule. Those exceptions are release subject to conditions, which is authorized by N.J.S.A. 30:4-27.15c and R. 4:74-7c(1), and continued extension pending placement, which is authorized by R. 4:74-7h(2).
N.J.S.A. 30:4-27.15c provides:
(1) The court may discharge the patient subject to conditions, if the court finds that the person does not need involuntary or continued involuntary commitment and the court finds:
(a) that the patient's history indicates a high risk of rehospitalization because of the patient's failure to comply with discharge plans; or
(b) that there is substantial likelihood that by reason of mental illness the patient will be dangerous to himself, others or property if the patient does not receive other appropriate and available services that render involuntary commitment unnecessary.
Conditions imposed pursuant to this statute expire after ninety days. N.J.S.A. 30:4-27.15c(2). Non-compliance with the conditions imposed may lead to recommitment. See In re Commitment of B.L., 346 N.J.Super. 285, 304-06, 787 A.2d 928 (App. Div.2002) (discussing procedures and standards).
Release subject to conditions diminishes but does not eliminate the curtailment of a patient's liberty and privacy interests. Cf. Griffin v. Wisconsin, 483 U.S. 868, 874, 107 S.Ct. 3164, 3169, 97 L.Ed.2d 709, 718 (1987) (discussing restrictions imposed in connection with probation and parole). Because conditional release continues restrictions on rights protected by the Constitution, a judge must ensure that the state complies with the substantive and procedural limitations on its commitment authority. Specifically, prior to imposing conditions on release, the judge must determine whether there is a high risk of rehospitalization as required by N.J.S.A. 30:4-27.15c(1)(a) or a substantial likelihood of danger to self, others or property as required by N.J.S.A. 30:4-27.15c(1)(b). Any condition must be reasonably related to the justification for the restriction.
The second exception to the general rule requiring discharge within forty-eight hours is provided by R. 4:74-7(h)(2). Pursuant to R. 4:74-7(h)(2), "if a patient otherwise entitled to discharge cannot be immediately discharged due to the unavailability of an appropriate placement," the court *501 has the authority to extend the patient's hospitalization by ordering CEPP and scheduling a placement review hearing within sixty days.
The Supreme Court first approved the status now known as CEPP in In re Commitment of S.L., supra, 94 N.J. at 132, 462 A.2d 1252. Recognizing that under O'Connor v. Donaldson "[t]he State cannot constitutionally commit individuals to mental hospitals solely on the basis of mental illness," the Court held that the state may continue to confine a person who is unable to "survive independently outside the institution without some care and supervision." S.L., supra, 94 N.J. at 132, 137, 139-40, 462 A.2d 1252. The patients involved in that case had been institutionalized for an average of over thirty years. Id. at 139, 462 A.2d 1252. In recognition of the difficult adjustments required by return to society following prolonged commitment, the Court held that the state could "of necessity continue the [patients'] confinement... on a provisional or conditional basis to protect their essential well-being," until their placement in properly supportive settings. Id. at 139-40, 462 A.2d 1252.
The Court reaffirmed the general rule an individual who "is no longer dangerous to self, others or property by reason of mental illness, ... shall be entitled to leave the mental hospital"and established a clear standard for CEPP"the individual is not able to survive in the community independently or with the help of family or friends." Id. at 139-41, 462 A.2d 1252. As the Court explained it, CEPP is available where the state would otherwise be required "to cast [] adrift into the community ... individuals ... incapable of survival on their own," and it is justified by the state's interest in protecting the "essential well-being" of these individuals. Id. at 140, 462 A.2d 1252.
Subsequent cases have not relaxed the standard set by the Supreme Court in S.L. While R. 4:74-7(h)(2) refers to circumstances in which "a patient cannot be immediately discharged due to the unavailability of an appropriate placement," this court has looked to S.L. and limited the scope of this exception to those who are "incapable of survival on their own." In re Commitment of G.G., 272 N.J.Super. 597, 604-05, 640 A.2d 1156 (App.Div.1994).
We have stressed that "CEPP is not intended as a means for extending an involuntary commitment simply because the hospital has not yet arranged for the periodic follow-up care of a patient not found to be a danger to self, others or property." Id. at 605, 640 A.2d 1156. And, we have cautioned that use of "that erroneous approach ... devalue[s] [the patient's] constitutional right to liberty." Ibid. We reaffirmed those principles in B.L., supra, 346 N.J.Super. at 308, 787 A.2d 928. Thus, CEPP is not a fallback option when the state cannot implement a discharge plan within forty-eight hours, and CEPP is not a means through which the judge may delay a conditional release.
The "unavailability of an appropriate placement" that warrants CEPP does not and cannot be read to authorize a host of subjective judgments about whether a patient who is entitled to discharge has desirable or optimal living arrangements and family relationships. Rather, the meaning of the phrase "appropriate placement" must be based on the justification for this exception to the general rule, which requires release of those who are not dangerous within the meaning of N.J.S.A. 30:4-27.2h, i. We reiterate that the justification is based on the patient's incapacity to survive. S.L., supra, 94 N.J. at 140, 462 A.2d 1252. Consistent with that rationale, the narrow question at issue with respect to "appropriate placement" is *502 a placement necessary to survival. Id. at 139-40, 462 A.2d 1252.
The cases before us demonstrate the need for judges confronted with the difficult human and societal problems posed by commitment cases to focus on the legal standards that limit the state's commitment authority. Disregard of and confusion about the applicable standard "devalue" the patient's "constitutional right to liberty." G.G., supra, 272 N.J.Super. at 605, 640 A.2d 1156.
C.H. had shelter available to him. His mother unequivocally indicated that her son could return to her home for ninety days. From the judge's cursory findings, we infer that he was concerned that C.H. would find shelter away from his parents' home without opportunity for the court to approve that shelter.
While well-intentioned, the judge's concern was misplaced. The court does not have general responsibility or authority to approve living arrangements. The questions the judge must resolve after finding that the person is not in need of commitment are narrowwhether there is evidence that supports imposition of continued restrictions under N.J.S.A. 30:4-27.15c and R. 4:74-7(h)(1) or a delay of release pursuant to R. 4:74-7(h)(2).
There was no evidence that C.H. needed a "supportive" environment to survive, as required for CEPP. Dr. Wayslow's interest in knowing more about a placement other than C.H.'s parents' home simply was not evidence of C.H.'s incapacity to survive or inability to function outside the mental hospital or his parents' home. S.L., supra, 94 N.J. at 140-41, 462 A.2d 1252. In order to place a person on CEPP, "the court has direct responsibility to be satisfied that the evidence is sufficient to support the conclusion reached." Id. at 141 n. 10, 462 A.2d 1252. Because his parents' home was available to him for a period of at least ninety days, there was no basis for a finding that confinement to ensure C.H.'s "safe and orderly transition... into an appropriate setting least restrictive of liberty" was necessary to his survival. Id. at 140, 462 A.2d 1252.
We further note that we do not see an adequate basis for conditioning C.H.'s release on his residing in a particular place. There was no showing of either a high risk of rehospitalization or "a substantial likelihood that by reason of [his] mental illness" C.H. would become "dangerous to himself, others or property" if he were to reside in a place other than his parents' home. N.J.S.A. 30:4-27.15c(1)(b).
A judge's good intentions and concern for the well-being of a patient do not justify continued confinement of a person who is not mentally ill and dangerous until such time as professionals find a setting that they deem "appropriate." The decision is one the judge must make under the applicable legal standards.
The order placing M.C. on CEPP is similarly unsupported by the evidence. The judge's failure to consider the standard to extend her commitment pending placement greatly devalued her liberty interest. While there was some evidence that there was a high risk of M.C.'s rehospitalization based on M.C.'s history of failing to comply with discharge plans, there was no evidence that she was incapable of surviving on return to her own home. While the court and the doctor expressed concern about M.C.'s husband's receptivity to her return, there was no evidence that M.C. required his assistance.
To the extent that the doctor expressed concern about M.C.'s husband and the impact of stress on his cardiac condition, there was no competent evidence of his condition. See In re Commitment *503 of J.B., 295 N.J.Super. 75, 78-79, 684 A.2d 925 (App.Div.1996). Nor was there any explanation of how M.C.'s presence in her home, by reason of her mental illness, would pose a substantially likely threat of serious bodily injury to her husband. See In re Commitment of W.H., 324 N.J.Super. 519, 524, 736 A.2d 529 (App.Div.1999); In re Commitment of A.A., 252 N.J.Super. 170, 179, 599 A.2d 573 (App.Div.1991). Indeed, the doctor's opinion and the judge's conclusion that M.C. was not dangerous to others within the meaning of the law were both unequivocal. As we have stated in the past, commitment in order to ensure compliance with a medication schedule to which the patient agrees is not a basis for continuing the commitment of a person who is not mentally ill and dangerous. See G.G., supra, 272 N.J.Super. at 604-05, 640 A.2d 1156. Conditional release, not CEPP, is the permissible means for addressing that issue. Ibid.
The order placing M.C. on CEPP status is reversed. The order placing C.H. on CEPP status is reversed.