# RECORD IMPOUNDED

## NOT FOR PUBLICATION WITHOUT THE APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3572-19

IN THE MATTER OF THE
CIVIL COMMITMENT OF
M.F.

_____

APPROVED FOR PUBLICATION

June 8, 2021

APPELLATE DIVISION

Argued December 2, 2020 – Decided June 8, 2021

Before Judges Alvarez, Geiger and Mitterhoff.

On appeal from the Superior Court of New Jersey, Law Division, Somerset County, Docket No. SOCC-000001-06.

Thomas G. Hand, Assistant Deputy Public Defender, argued the cause for appellant M.F. (Joseph E. Krakora, Public Defender, attorney; Thomas G. Hand on the briefs).

Anthony J. Serra argued the cause for respondent W. F. (Serra Law Group, attorneys; Anthony J. Serra on the brief).

The opinion of the court was delivered by

MITTERHOFF, J.A.D.

M.F.'s assigned counsel appeals from a February 19, 2020 order granting M.F.'s legal guardian's application to intervene in M.F.'s involuntary

commitment proceedings.[1]  On appeal, M.F.'s counsel argues the guardian has not met the criteria for intervention under Rule 4:33-1 or Rule 4:33-2, and that the plain language of N.J.S.A. 30:4-27.12 precludes intervention as a matter of law.  This case presents the issue of who is entitled to express a position on whether M.F., a gravely disabled patient involuntarily committed to a psychiatric hospital, continues to meet the statutory definition of dangerousness.  The issue is complicated by the fact that M.F. is unable to express his preference due to his debilitating mental illness.

Based upon the record and in light of the applicable law, we affirm the judge's order allowing the legal guardian to intervene, not to usurp assigned counsel's role, but to fulfill his separate duties to safeguard the welfare of his ward.  Because M.F.'s views are not easily or readily ascertainable, however, and considering the sharp divergence of the views of the legal guardian and assigned counsel, we direct that on remand the judge appoint an attorney to serve as guardian ad litem for M.F., to conduct an investigation, and report his or her findings to the court.

We derive a brief history of the onset and progression of M.F.'s mental illness and his ensuing long-term institutionalization from documents

---

[1] The county adjuster took no position and is not participating in this appeal.

A-3572-19

contained in the record.[2] M.F. is a fifty-nine-year-old male who has been committed at Greystone Park Psychiatric Hospital in Morris Plains since January 25, 2012. A June 9, 2006 consultation report by Ross J. Baldessarini, M.D., indicates that M.F., then forty-five years old, had been institutionalized at Ancora State Psychiatric Hospital for three years, "following prolonged and slowly more disabling mental illness that started when he started college in [Pennsylvania] at age [eighteen]."

M.F. exhibited no early warning signs of mental illness before his senior year in high school. To the contrary, prior to his senior year in high school, M.F. "did very well academically, socially, and athletically, . . . was an A-student and National Merit Scholar, and was accepted by several prominent colleges, including Princeton," although he chose to matriculate at Villanova. In his senior year of high school, in what Dr. Baldessarini describes as a possible prodrome, M.F. began "behaving oddly and wanting to give away his belongings." More acute illness erupted in his first year at Villanova, manifested by "grandiose and religious delusions," "probable auditory

---

[2] We recognize that the judge sustained an objection to the admission of the hearsay medical records to support the guardian's motion for reconsideration. We do not rely on them as evidential support of our decision whether the guardian may intervene. Rather, we discuss M.F.'s documented medical history merely to add context to the underlying dispute and the factual basis for some of the guardian's concerns.

hallucinations," and "very occasional episodes of explosive excitement with aggressive threats or actions" that persist to date. In his late twenties through his thirties, M.F. resided in group homes for psychiatric patients. He was transferred to long-term psychiatric hospitalization, however, after "a brief period of wandering and living in the streets in 2003."[3]

The doctor's impression at that time, based on history, medical records, and examination, was as follows:

> This patient is suffering from a chronic and slowly progressive form of severe mental illness. Despite suggestive "manic" elements, he does not have a history of sustained elevations or of cyclic major changes in mood, and the previously suggested formulation of bipolar schizoaffective disorder seems less likely than a hebephrenic (disorganized) form of schizophrenia, though very distinct from other forms, and perhaps the least well studied therapeutically.[4]

In 2006, M.F. was adjudicated an incapacitated person, and M.F.'s brother, W.F., was appointed as his general co-guardian.[5] Although there are no documents in the record evidencing M.F.'s initial involuntary commitment

---

[3] A June 17, 2019 Greystone commitment review hearing report also notes as part of M.F.'s history that "[t]he patient eloped from a group home, [and] was found naked, eating out of dumpsters."

[4] The remainder of the report contains recommended medication regimens.

[5] M.F.'s mother is the co-guardian.

A-3572-19

hearing, we infer that it occurred from the evidence in the record of the periodic reviews that followed.

We begin with a brief review of the relevant statutes and court rules, which guide our analysis. "A patient who is involuntarily committed to treatment . . . shall receive a court hearing with respect to the issue of continued need for involuntary commitment within 20 days from initial commitment . . . ." N.J.S.A. 30:4-27.12(a). Normally, "the assigned county counsel is responsible for presenting the case for the patient's involuntary commitment to the court, unless the county adjuster is licensed to practice law in this State, in which case the county adjuster shall present the case . . . ." N.J.S.A. 30:4-27.12(b). The patient has the right to be represented by an attorney, N.J.S.A. 30:4-27.11(c), must "have counsel present at the hearing[,] and shall not be permitted to appear at the hearing without counsel." N.J.S.A. 30:4-27.12(d). "The patient, through counsel, shall have the right to present evidence and to cross-examine witnesses." R. 4:74-7(e).

Certain evidence must be presented at the hearing. The application for commitment shall be supported by the "testimony of a psychiatrist on the patient's treatment team who has conducted a personal examination of the patient as close to the court hearing date as possible, but in no event more than five calendar days prior to the court hearing." Ibid. The court may also order

any licensed psychologist who has examined the patient to appear and testify. Ibid.

"The court shall enter an order authorizing involuntary commitment of the patient . . . if it finds, by clear and convincing evidence presented at the hearing that the patient is in need of continued involuntary commitment to treatment" because the "patient is mentally ill" and the "mental illness causes the patient to be dangerous to self or dangerous to others or property." R. 4:74-7(f)(1). Of relevance to this appeal:

> "Dangerous to self" means that by reason of mental illness the person has threatened or attempted suicide or serious bodily harm, or has behaved in such a manner as to indicate that the person is unable to satisfy his need for nourishment, essential medical care or shelter, so that it is probable that substantial bodily injury, serious physical harm, or death will result within the reasonably foreseeable future; however, no person shall be deemed to be unable to satisfy his need for nourishment, essential medical care, or shelter if he is able to satisfy such needs with the supervision and assistance of others who are willing and available. This determination shall take into account a person's history, recent behavior, and any recent act, threat, or serious psychiatric deterioration.
>
> [N.J.S.A. 30:4-27.2(h) (emphasis added).]

In so finding, the court must determine that "less restrictive alternative services are not appropriate or available to meet the patient's mental health care needs." R. 4:74-7(f)(1).

A-3572-19

The court must then conduct "periodic reviews of the commitment." R. 4:74-7(f)(2). The court is required to conduct review hearings three times in the first year of commitment, followed by at least one review annually "if the patient is not sooner discharged." Ibid. Each review hearing follows the same procedure established for the initial involuntary commitment hearing, and if the court determines that involuntary commitment shall continue, "it shall execute a new order." Ibid. "If the court concludes at the review hearing that the evidence does not warrant continued commitment to treatment, it shall order that the patient be discharged." R. 4:74-7(h)(1).

"If the [S]tate fails to establish each element essential to authorize further restrictions on the patient's liberty, the general rule requires discharge upon completion of discharge plans within forty-eight hours." In re Commitment of M.C., 385 N.J. Super. 151, 160 (App. Div. 2006) (citing N.J.S.A. 30:4-27.15(b)). However, "[t]here are two narrow exceptions to the general rule." Ibid.

The first exception, not applicable here, is release subject to conditions. Ibid. The second exception to the general rule is an "Order of Conditional Extension Pending Placement," or CEPP. R. 4:74-7(h)(2). Pursuant to Rule 4:74-7(h)(2), "if a patient otherwise entitled to discharge . . . cannot be immediately discharged due to the unavailability of an appropriate placement,

the court shall enter an order conditionally extending the patient's hospitalization and scheduling a placement review hearing within [sixty] days thereafter."  Our Supreme Court first approved the "hybrid status" then referred to as "discharged pending placement," and now known as CEPP, in the case In re S.L., 94 N.J. 128, 133, 142 (1983).  There, "the Court held that the [S]tate may continue to confine a person who is unable to 'survive independently outside the institution without some care and supervision.'" M.C., 385 N.J. Super. at 161 (quoting S.L., 94 N.J. at 132, 137, 139-40).

Although Rule 4:74-7(h)(2) "refers to circumstances in which 'a patient cannot be immediately discharged due to the unavailability of an appropriate placement,' [the Appellate Division] has looked to S.L. and limited the scope of this exception to those who are 'incapable of survival on their own.'" Id. at 162 (quoting In re Commitment of G.G., 272 N.J. Super. 597, 604-05 (App. Div. 1994)).  "Thus, CEPP is not a fallback option when the [S]tate cannot implement a discharge plan within forty-eight hours, and CEPP is not a means through which the judge may delay a conditional release." Ibid.  An order placing a patient on CEPP must be supported by evidence that he or she is incapable of surviving discharge, not "subjective judgments about whether a patient who is entitled to discharge has desirable or optimal living arrangements and family relationships." Id. at 163-64.

A-3572-19

In this case, it is undisputed that M.F. is incapable of survival on his own, and that he requires and will require a significant amount of care on an inpatient basis, including close monitoring of his medication and blood levels. It appears highly unlikely he will be "discharged" in a literal sense. Thus, there is no question he satisfies the statutory first prong of the "danger to self" standard applicable to the gravely disabled. Unfortunately, due to his serious condition, M.F. himself is unable to express a preference whether to remain at Greystone or step down to another type of facility, such as a nursing home or group home. M.F.'s counsel argues that M.F. no longer meets the statutory definition of dangerousness and that due process requires that he be discharged and placed in an alternative setting. M.F.'s brother and legal guardian successfully sought intervention to argue that M.F.'s placement at Greystone should continue because of the absence of a less restrictive setting that is able to meet M.F's needs.

On June 12, 2019, Judge Louis Mellinger conducted a commitment review hearing for M.F. M.F.'s treating psychiatrist at Greystone, Dr. Svetlana Volskaya, testified that M.F. was "unable to take care of himself" and that the guardian "is in total agreement . . . that [Greystone is] the least restrictive place" for him. The doctor offered no discharge plan because, in her opinion, he was not appropriate for a group home setting and he was too young to be in

9

a nursing home. She believed he benefitted from activities at Greystone and that it was, for the time being, the least restrictive placement for M.F. No other witnesses testified at the hearing.

The judge concluded that although from a "humanitarian" point of view, Greystone may be the least restrictive setting for M.F., from a due process perspective the county adjuster failed to demonstrate by clear and convincing evidence that M.F. presented a danger to himself, others, or property, N.J.S.A. 30:4-27.2(m). Accordingly, the judge placed M.F. on CEPP status. See R. 4:74-7(h)(2). The judge also ordered that W.F. appear at the next hearing on October 2, 2019, to review discharge planning.

Before that hearing could take place, the guardian moved for reconsideration of the June 12, 2019 order that placed M.F. on CEPP status. The guardian provided a certification which stated, in part, that it was in M.F.'s "best interest that he remain committed at Greystone and that releasing him to a different, less restrictive facility, would be detrimental to his well-being."

On July 10, 2019, the judge heard arguments on the motion for reconsideration. M.F.'s attorney argued that the guardian did not have standing to file the motion because he was not a party in the matter. W.F. countered that, as the legal guardian for his brother, he was an interested party in the case. The judge agreed that "the guardian does have standing to bring a

motion" because the "guardian stands absolutely in the shoes of the patient."

Despite this pronouncement, the judge carried the matter for two weeks to allow Greystone to determine whether it would re-screen M.F. for re-commitment, thus obviating the need to decide the motion for reconsideration.

On July 24, 2019, the judge again heard arguments on the motion for reconsideration. The guardian advised the judge that recommitment was abandoned in favor of pursuing reconsideration of the June 12, 2019 order. At this point, the judge observed that:

> I don't know that the guardian has standing . . . to be heard with regard to whether the patient should be moved to CEPP status or kept in committed status. That's not a province of the guardian. The province of the guardian is . . . to protect the patient's interest as to perhaps where they're going to be placed, or as to treatment that's going to be resolved beyond the hospital, or even issues involving the patient while at the hospital, but not as to whether the patient is in committed status or not. The guardian doesn't have input or expert testimony as to whether the patient is in committed status. That's the province of the doctors and other experts.
>
> So, I don't know that the guardian [has] standing
> . . . .

Unfortunately, the judge never definitively resolved the issue of standing until February 19, 2020.

A-3572-19

Meanwhile, M.F. remained on CEPP status between June and December 2019. While on CEPP status, M.F. was considered for, and ultimately rejected from, A-Plus Group Home because they could not accommodate his level of care. The record does not reflect whether other placements were considered in this time frame.

The judge, however, tacitly approved the guardian's intervention on December 11, 2019. He allowed "the guardian to participate through counsel in any further civil commitment hearings," thus permitting "the guardian to aver the guardian's position, either through evidence, witnesses, [or] closing statements." The judge ordered that M.F. could not be discharged from CEPP status without further application to the court. The judge set a February 19, 2020 hearing date.

In the interim, on December 26, 2019, M.F. was involved in an incident where he struck another patient at Greystone in the face and, consequently, Greystone filed for M.F.'s recommitment. A commitment review hearing was ordered to take place on January 8, 2020.

At that hearing, Dr. Volskaya testified that M.F. remained a danger to others based on the assault. She also testified that M.F. was a danger to himself because of his high creatinine levels, which require close monitoring. Dr. Volskaya indicated that in October she reduced M.F.'s lithium dosage

because of his elevated creatinine levels. Dr. Volskaya opined that the December 26, 2019 incident was causally related to the dosage change. The guardian's attorney was permitted to cross-examine Dr. Volskaya over M.F.'s assigned counsel's objection. The judge overruled the objection on the grounds that he previously found "the guardian stands in the shoes of the patient" and has an interest in the welfare of the patient. The judge ultimately determined that continuing commitment was necessary because the county adjuster proved, by clear and convincing evidence, that M.F. was a danger to others based on the short period of time since the December 26, 2019 incident.[6]

On February 19, 2020, the judge heard arguments on M.F.'s assigned counsel's motion to bar the participation of the guardian and the guardian's cross-motion to participate. The judge held that the guardian established the criteria for intervention under Rule 4:33-1 and was permitted to participate in the proceedings:

> the criteria has been met for intervention. The guardian stands in the shoes of the ward and is charged with the duties and responsibilities under the guardian statute; (2) has the right under the guardian statute and duty to protect the best interest and well-

---

[6] The January 8, 2020 order is the subject of an appeal pending under Docket No. A-2737-19, also decided today.

A-3572-19

being of the ward, and medically also under the guardian statute; (3) the guardian asserts that the ward's interest is not adequately protected because he disagrees with the public defender and asserts that . . . Greystone is the best and safest environment for the ward and asserts the potential danger with regard to the [neuroleptic malignant] syndrome,[7] and the ward has only known Greystone since 2012 – these are all legitimate concerns and empowered under the guardian statute; and (4) a timely application to intervene must be made.

The judge issued an accompanying written order mirroring his oral decision.

On appeal, M.F.'s assigned counsel raises the following issues for our consideration:

POINT I

THE TRIAL COURT'S DECISION TO ALLOW M.F.'S GUARDIAN TO INTERVENE IN THIS MATTER MUST BE REVERSED BECAUSE M.F.'S GUARDIAN FAILED TO SATISFY THE REQUIREMENTS FOR INTERVENTION AS REQUIRED BY THE COURT RULES, THE CONSTITUTION[,] AND CASE LAW[,] AND HIS INTERVENTION HAS AND WILL CONTINUE TO HARM M.F.

A. THE TRIAL COURT ERRED AS A MATTER OF LAW WHEN IT MISAPPLIED

---

[7] According to the National Institute of Neurological Disorders and Stroke, neuroleptic malignant syndrome "is a life-threatening, neurological disorder most often caused by an adverse reaction to neuroleptic or antipsychotic drugs." Neuroleptic Malignant Syndrome Info. Page, Nat'l Inst. of Health, https://www.ninds.nih.gov/Disorders/All-Disorders/Neuroleptic-Malignant-Syndrome-Information-Page.

A-3572-19

THE COURT RULES TO ALLOW THE GUARDIAN TO INTERVENE IN THIS CIVIL COMMITMENT AND PROSECUTE THE ACTION FOR CIVIL COMMITMENT, A POWER WHICH ONLY RESIDES WITH THE STATE.

B. THE TRIAL COURT ERRED AS A MATTER OF LAW WHEN IT IGNORED THE CLEAR AND UNAMBIGUOUS LANGUAGE OF N.J.S.A. 30:4-27.12 TO GRANT THE GUARDIAN THE AUTHORITY TO INTERVENE IN THE CIVIL COMMITMENT PROCEEDING AND CO-PROSECUTE COMMITMENT OF HIS WARD BY PRESENTATION OF HIS OWN WITNESSES.

C. THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT GRANTED THE GUARDIAN PERMISSION TO INTERVENE IN THIS MATTER AND THE GUARDIAN'S INTERVENTION HAS AND WILL CONTINUE TO HARM M.F.

We reject M.F.'s argument that N.J.S.A. 30:4-27.12 categorically precludes the guardian from intervening in his ward's commitment hearing. "When construing a statute, our primary goal is to discern the meaning and intent of the Legislature." State v. Gandhi, 201 N.J. 161, 176 (2010). "To determine that intent, 'we look first to the plain language of the statute, seeking further guidance only to the extent that the Legislature's intent cannot be derived from the words that it has chosen.'" McGovern v. Rutgers, 211 N.J. 94, 108 (2012) (quoting Bosland v. Warnock Dodge, Inc., 197 N.J. 543, 553

(2009)). When a statute's plain language is clear, our interpretative task is complete. In re Kollman, 210 N.J. 557, 568 (2012) (citing N.J. Ass'n of Sch. Adm'rs v. Schundler, 211 N.J. 535, 549 (2012)).

N.J.S.A. 30:4-27.12 reads, in part, that:

> b. Except as provided in subsection c of this section, the assigned county counsel is responsible for presenting the case for the patient's involuntary commitment to the court, unless the county adjuster is licensed to practice law in this State, in which case the county adjuster shall present the case for the patient's involuntary commitment to the court.
>
> c. Notwithstanding the provisions of subsection b. of this section and upon notice to the county adjuster:
>
> > (1) The Attorney General, or the county prosecutor acting at the request of the Attorney General, may supersede the county counsel or county adjuster and assume responsibility for presenting any case for involuntary commitment to treatment or may elect to participate with the county counsel or county adjuster in presenting any such case; and
> >
> > (2) The county prosecutor may supersede the county counsel or county adjuster and assume responsibility for presenting any case for involuntary commitment to treatment initiated by the county prosecutor pursuant to subsection c. of section 10 of P.L.1987, c.116 (C.30:4-27.10) or may elect to participate with the county counsel in the presentation of any such case.

M.F.'s assigned counsel has steadfastly adhered to the view that because the statute specifically names the county adjuster, prosecutor, or Attorney General as persons entitled to present a case for commitment, the guardian has no role in the matter because he cannot subsume the role of the prosecuting authority. Although we agree W.F. cannot subsume the county adjuster's role in presenting the case, the statute does not expressly prohibit the intervention of the legal guardian for other purposes. As the judge recognized, the guardian owes a duty to M.F. to safeguard his well-being and protect his best interests particularly where, as here, the "wishes of the ward are not ascertainable with reasonable efforts." N.J.S.A. 3B:12-56(d).

We also reject M.F.'s counsel's argument that the judge abused his discretion in allowing W.F. to intervene. Rule 4:33-2, in pertinent part, states that "anyone may be permitted to intervene in an action if the claim or defense and the main action have a question of law or fact in common." Because Rule 4:33-2 is "the more liberal permissive intervention rule," we must "review the court's determination of a permissive intervention motion under an abuse of discretion standard." N.J. Dep't of Env't Prot. v. Exxon Mobil Corp., 453 N.J. Super. 272, 286-87 (App. Div. 2018) (citing City of Asbury Park v. Asbury Park Towers, 388 N.J. Super. 1, 12 (App. Div. 2006)).

M.F.'s serious condition, which is undisputed, requires significant institutional care and supervision. His diagnosis of schizophrenia, disorganized type, is complicated by a history of neuroleptic malignant syndrome, which according to his treating doctors is triggered by changes in his environment.[8] Indeed, M.F. was rejected from one facility because they could not accommodate his level of care. Because the gravity of his condition also means he cannot communicate his wishes or desires, it is the guardian's statutorily vested duty to exercise M.F.'s rights in a manner consistent with his best interests. N.J.S.A. 3B:12-56(d). Mindful of these unique circumstances,

---

[8] A June 2019 commitment review report described the nature of this condition:

> The patient does not tolerate changes in environment well. When he was transferred from Hagedorn to Greystone Park Psychiatric Hospital in 2012, several times he developed neuroleptic malignant syndrome (which is potentially a deadly condition, which requires all antipsychotics to be stopped). As a result of that, he developed severe psychosis with paranoia and became very assaultive, had to be transferred to a different unit in order to stabilize him. It took the patient [a] very long time to decrease psychosis and improved ADL's, but not to the level he had before his transfer to Greystone Park Psychiatric Hospital. He remains in active treatment. Recently lithium was decreased because of the side effects of increase in creatinine.

we conclude that it was not an abuse of discretion to permit the guardian to intervene in this matter on behalf of his ward.

We note that the judge had considered appointing a guardian ad litem for M.F.  Pursuant to Rule 4:86-4(d), the court may appoint a guardian ad litem "in addition to counsel . . . to evaluate the best interests of the alleged incapacitated person and to present that evaluation to the court," though such appointments are reserved for "special circumstances." In addition, Rule 4:26-2, "which governs the appointment of a guardian to represent the interest of an infant or incompetent person in the context of a particular litigation . . . ."  In re Clark, 212 N.J. Super. 408, 412 (Ch. Div. 1986), provides that:

> a minor or mentally incapacitated person shall be represented in an action by the guardian of either the person or the property, appointed in this State, or if no such guardian has been appointed or a conflict of interest exists between guardian and ward or for other good cause, by a guardian ad litem appointed by the court . . . .
>
> [Rule 4:26-2(a)].

Our Supreme Court discussed the distinct nature of the roles of assigned counsel and a guardian ad litem in the case In re M.R., 135 N.J. 155, 172-78 (1994), involving a developmentally disabled young woman's specific capacity to choose where to live.  M.R.'s father argued "that the hearing was unfair because M.R.'s appointed counsel did not zealously advocate her stated

19

preference to live with him." Id. at 172. Pursuant to the version of Rule 4:86-4 in effect at the time – which neither required counsel to argue the alleged incompetent's stated preferences, nor permitted the appointment of a guardian ad litem in some cases – M.R.'s attorney recommended that M.R.'s preference should not be given significant weight, and that "either household would serve M.R.'s best interests." Id. at 173. The question, the Court said, was "whether the role of appointed counsel for an incompetent is zealously to advocate the incompetent's position or simply to inform the court of counsel's perception of the incompetent's best interests." Id. at 172.

Looking to "the analogous context of child-custody cases," in which a court normally appoints counsel to represent the child and a guardian ad litem to conduct independent factfinding and make a recommendation based on the child's best interests, id. at 173-74, the Court explained:

> In sum, several reasons support the distinction between an attorney and a guardian ad litem for an incompetent. First, the attorney and guardian ad litem may take different positions, with the attorney advocating a result consistent with the incompetent's preferences and the guardian urging a result that is different but in the incompetent's best interests. Second, the attorney and guardian may differ in their approaches. When interviewing interested parties, the attorney for an incompetent should proceed through counsel, but often a guardian ad litem may communicate directly with other parties. Finally, a guardian may merely file a report with the court, but

20

the attorney should zealously advocate the client's cause.

[Id. at 175.]

The Court concluded that not "every case [would] require both in the future," but that in some cases, "an incompetent, like a minor, may need both an attorney and a guardian ad litem." Ibid. Accordingly, the Court stated that on remand, M.R.'s "attorney's role should be to advocate her choice, as long as it does not pose unreasonable risks for her health, safety, and welfare," and that "[i]f the court concludes that M.R. is incapable of deciding where to live, it may appoint a guardian ad litem to represent her best interests." Id. at 178.

In this case, M.F. is incapable of communicating his own wishes or desires to his counsel. Thus, counsel is merely reporting to the court his perception of what is in his client's best interests. Under those circumstances, M.R. directs that appointment of a guardian ad litem for an adult incompetent may be appropriate. Ibid.

We conclude that "special circumstances" exist to appoint a guardian ad litem given M.F's inability to communicate with assigned counsel. R. 4:86-4(d). We also conclude that good cause exists due to the sharply divergent views giving rise to a conflict between M.F.'s guardian and his assigned counsel, R. 4:26-2(a), which likewise warrants the appointment of a guardian

ad litem on behalf of M.F. to make decisions or recommendations to the court guided by the best interest standard.

To the extent we have not addressed any of the remaining arguments raised by the parties, we conclude they are without sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-3572-19